**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **JANE DOE**,<br><br>        *Plaintiff*,<br><br>v.<br><br>**CORRECTIONS CORPORATION OF AMERICA**; ARVIL "BUTCH" CHAPMAN, in his individual capacity and in his official capacity as warden of the South Central Correctional Facility; JOHN ROE SULLIVAN, in his individual capacity and in his official capacity as chief of security of the South Central Correctional Facility; JANE ROE GARSKA, in her individual capacity; JANE ROE QUALLS, in her individual capacity; JOHN ROE HERNDON, in his individual capacity; JANE ROE GONZALES, in her individual capacity; and CORRECTIONS OFFICER JOHN ROE, in his individual capacity,<br><br>        *Defendants*. | Case No. _____ |

JURY DEMAND

**COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF**

COMES NOW Plaintiff Jane Doe, by and through her undersigned counsel, and states as follows for her Complaint:

**INTRODUCTION**

1.      This is an action to vindicate a visitor's constitutional rights related to an invasive and humiliating seizure and search at the South Central Correctional Facility ("SCCF") in Clifton, Tennessee, a prison owned and managed by Corrections Corporation of America ("CCA"). Despite the absence of any individualized suspicion whatsoever, Defendants, through their acts and omissions and pursuant to a custom carrying the force of law, required Plaintiff to expose her

unclothed genitalia to corrections officers to "verify" that she was menstruating. Defendants' conduct deprived Plaintiff of her constitutional rights to be free from unreasonable search and seizure, equal protection of the laws, and the right against deprivation of liberty and privacy without due process of law. Defendants' conduct also violated the laws of the State of Tennessee. This lawsuit seeks to have Defendants' strip-search policy declared unconstitutional and enjoined. This lawsuit also seeks compensatory damages and punitive damages for Defendants' unconscionable and callous disregard of Plaintiff's rights.

## PARTIES

2.      Plaintiff **Jane Doe** is a living, natural person and resident of Tennessee and of this judicial District. The name "Jane Doe" is a fictitious pseudonym. Because of the extremely humiliating and embarrassing nature of the facts alleged in her Complaint, Plaintiff has concurrently filed a Motion for Protective Order, which would permit her to proceed under the pseudonym "Jane Doe," with her true name and identity being disclosed to the Court and Defendants under seal but protected from public disclosure. Public knowledge of the harm Plaintiff suffered would bring additional embarrassment, shame, and scorn upon her. At the times relevant to this her Complaint, Plaintiff was a <u>visitor</u> at the South Central Correctional Facility.

3.      Defendant **Corrections Corporation of America** is a Maryland corporation headquartered in Tennessee, with its principal place of business at 10 Burton Hills Boulevard, Nashville, Tennessee. CCA is a for-profit, publicly traded (NYSE: CXW) real estate investment trust that "specializes in owning, operating and managing prisons and other correctional facilities" and has referred to itself as "the nation's largest owner of partnership correction and detention facilities and one of the largest prison operators in the United States." CCA's website boasts that the corporation operates more than 60 detention facilities, jails, and prisons holding more than

90,000 beds. CCA operates SCCF under the full authority of the State of Tennessee pursuant to Tenn. Code Ann. §§ 41-24-101, *et seq.*, and/or 41-8-101, *et seq.* At all times relevant to Plaintiff's Complaint, CCA was acting under color of state law. CCA is the entity charged by the State of Tennessee with authority to maintain the SCCF and has a non-delegable duty to ensure that all visitors are protected by the Constitutions and laws of the United States and the State of Tennessee. Defendant CCA is responsible for the implementation of policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this action. CCA is licensed to do business in Tennessee and may be served through its registered agent, CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

4.    Defendant **Arvil "Butch" Chapman** is believed to be a resident of Tennessee. Defendant Chapman is the warden of the South Central Correctional Facility in Clifton, Tennessee. As such he is the chief executive officer of SCCF and exercises plenary authority over all SCCF staff. At all times relevant to Plaintiff's Complaint, Defendant Chapman was acting under color of state law. Defendant Chapman is sued in his official capacity as warden of SCCF and in his individual capacity.

5.    Defendant **John Roe Sullivan** is believed to be a resident of Tennessee. On information and belief, Defendant Sullivan is the chief of security at CCA's SCCF. The name "John Roe Sullivan" is a pseudonym, as Plaintiff does not have knowledge of Defendant Sullivan's complete name. Plaintiff anticipates she will learn Defendant Sullivan's complete name through discovery. On information and belief, Defendant Chapman as warden delegated responsibility for prison security to Defendant Sullivan. At all times relevant to Plaintiff's Complaint, Defendant Sullivan was acting under color of state law. Defendant Sullivan is sued in his official and individual capacities.

3

6.     Defendant **Jane Roe Garska** is believed to be a resident of Tennessee. Defendant Garska is a correctional officer or guard at the South Central Correctional Facility. The name "Jane Roe Garska" is a pseudonym, as Plaintiff does not have knowledge of Officer Garska's complete name. Plaintiff anticipates she will learn Defendant Garska's complete name through discovery. At all times relevant to Plaintiff's Complaint, Officer Garska was acting under color of state law. Defendant Garska is sued in her individual capacity.

7.     Defendant **Jane Roe Qualls** is believed to be a resident of Tennessee. Defendant Qualls is a correctional officer or guard at the South Central Correctional Facility. The name "Jane Roe Qualls" is a pseudonym, as Plaintiff does not have knowledge of Officer Qualls's complete name. Plaintiff anticipates she will learn Defendant Qualls's complete name through discovery. At all times relevant to Plaintiff's Complaint, Officer Qualls was acting under color of state law. Defendant Qualls is sued in her individual capacity.

8.     Defendant **John Roe Herndon** is believed to be a resident of Tennessee. Defendant Herndon is a correctional officer or guard at the South Central Correctional Facility. The name "John Roe Herndon" is a pseudonym, as Plaintiff does not have knowledge of Officer Herndon's complete name. Plaintiff anticipates she will learn Defendant Herndon's complete name through discovery. At all times relevant to Plaintiff's Complaint, Officer Herndon was acting under color of state law. Defendant Herndon is sued in his individual capacity.

9.     Defendant **Jane Roe Gonzales** is believed to be a resident of Tennessee. Defendant Gonzales is a CCA employee, who, upon information and belief, is in charge of visitation at SCCF under the direction and control of Defendants Sullivan, Chapman, and CCA. The name "Jane Roe Gonzales" is a pseudonym, as Plaintiff does not have knowledge of Defendant Gonzales's complete name. Plaintiff anticipates she will learn Defendant Gonzales's complete name through

4

discovery. At all times relevant to Plaintiff's Complaint, Defendant Gonzales was acting under color of state law. Defendant Gonzales is sued in her individual capacity.

10. Defendants **Corrections Officers John Roe** is believed to be a resident of Tennessee. The true name and identity of Defendant John Roe is at present unknown to Plaintiff, but Plaintiff anticipates she will learn his true name through discovery. At all times relevant to Plaintiff's Complaint, Defendant Roe were acting under color of state law. John Roe is sued in his individual capacity.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367. Injunctive relief is authorized by Fed. R. Civ. P. 65. Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant CCA is a resident of this District, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## FACTUAL ALLEGATIONS

13. On April 20, 2014, Plaintiff Jane Doe traveled to SCCF to visit an inmate, which had been approved by Defendant CCA, as she had done many times before.

14. Plaintiff was an authorized visitor at South Central Correctional Facility on April 20, 2014.

15. Plaintiff, a woman of childbearing age, was having her menstrual cycle at the time of her April 20, 2014 visit.

16. Ms. Doe underwent security screening at SCCF. At approximately 8:43 a.m., Plaintiff cleared the first checkpoint.

17.	At another security checkpoint on the way to conduct her visitation, Defendant Garska inquired about Ms. Doe's feminine sanitary napkin, which Plaintiff left visible protruding out of her pocket.

18.	Plaintiff informed corrections officers Defendants Garska and Herndon that she was menstruating and asked the officers what CCA's policy was for feminine hygiene products. Plaintiff voluntarily removed the wrapped sanitary napkin and placed it on the desk to show Defendants Garska and Herndon. Officer Garska Responded that SCCF would have to give Plaintiff a CCA-approved sanitary napkin.

19.	Then, Defendant Garska said words to the effect of, "But I'll have to make sure you are."

20.	Defendant Garska then repeated words to the effect of, "We have to make sure you are actually—."

21.	Plaintiff asked Defendants Garska and Herndon how the CCA officers intended to verify that she was menstruating.

22.	Defendant Garksa responded, "We'll have to see."

23.	Then, Defendant Garska isolated Plaintiff from the metal detector checkpoint area and took her to a vacant restroom, where she conducted a pat-down frisk of Plaintiff's body. Defendant found no contraband.

24.	After Ms. Doe cleared the patdown search, Defendants Herndon and Garska commanded Plaintiff to put her shoes back on and sit in a certain spot.

25.	Fearful that Defendant Garska's comments meant that she would have to somehow provide proof of her menses, Plaintiff asked Defendant Garska and Defendant Herndon which

CCA, Tennessee Corrections Institute, or Department of Corrections policy authorized their conduct. The officers never responded.

26. SCCF's visitor policy at all times relevant to this action stated, *inter alia*:

[S]hould you refuse to consent to the search of your personal vehicle or attempt to evade/flee without being searched, your visitation privileges may be permanently suspended from any CCA/TDOC Facility.

and

Any visitor refusing a search of any type may be permanently restricted from visiting at any TDOC facility.

27. Plaintiff offered the Defendant officers several options that would have demonstrated that she was, in fact, menstruating, in lieu of undergoing a full-fledged search of her genitals. Plaintiff was fearful that she may have to expose her genitalia to strangers.

28. For example, Plaintiff offered to simply leave SCCF altogether or cut short her visit should she need to use the restroom and replace her sanitary napkin. Plaintiff offered to urinate in a toilet—without flushing—and then allow the Defendant corrections officers to see the toilet bowl containing her urine and uterine blood. Plaintiff also offered to change her sanitary or "maxi" pad and show the officers the pad containing her menstrual blood in the trash.

29. Defendants Garska and Herndon refused all of Plaintiff's requests for accommodation.

30. Defendants Garska and Herndon used their radios to call for a female correctional officer.

31. Later, a female correctional officer, Defendant Qualls, arrived and asked Plaintiff, "What's going on?"

32. Plaintiff responded that she was on her period.

33. Defendant Qualls said, "Oh great," in a sarcastic tone of voice, and immediately walked into a women's restroom at SCCF.

34. Plaintiff entered the restroom, still asking what she was supposed to do.

35. Defendant Garska said, "Show me."

36. Defendant Garska stood directly in front of Plaintiff, and Defendant Qualls stood near the door of the restroom. Defendants Herndon and John Roe stood outside the door.

37. Plaintiff asked Defendant Garska words to the effect of, "What do you want me to do?"

38. Defendant Garska replied, "What do you think? Show me!"

39. Plaintiff pulled her pants and underwear down, exposing her genitalia. Defendant Garska visually inspected Plaintiff's exposed genitalia and looked upon her vaginal area. Defendant Garska positioned herself so that her eyes were approximately level with Plaintiff's hips and unclothed pelvic area.

40. After Defendant Garska was satisfied that Plaintiff was menstruating, Ms. Doe was permitted to raise her pants and exit the prison's visitation-area restroom.

41. Defendants then permitted Plaintiff to proceed with her visitation.

42. Plaintiff had never been suspected of attempting to smuggle or otherwise bring contraband into SCCF or any other correctional facility, or of any other misconduct involving a correctional facility.

43. After the completion of her visit at SCCF, Plaintiff telephoned the facility to inquire about the policy, fearful of a similar search occurring in the future should she choose to visit SCCF while on her menstrual cycle.

44. Plaintiff spoke with Defendant Sullivan, CCA's chief of security at SCCF.

8

45.     Plaintiff said to Defendant Sullivan, "Please explain to me … the standard procedure and policy for [a] female visitor that comes to visit when she's on her menstrual cycle?" Defendant Sullivan stated that he was "busy" and asked her to "cut to the chase."

46.     Plaintiff said, "For any reason, should a female visitor be asked to remove her pants and underwear for a search?" Defendant Sullivan responded, "Yes."

47.     Plaintiff followed up, "That's standard?" Defendant Sullivan said, "Mmmhmm."

48.     Plaintiff continued, "To prove she's on her menstrual cycle?" Defendant Sullivan said, "Yes."

49.     Plaintiff asked, "That is standard?" Defendant Sullivan said, "Yes."

## INJUNCTION ALLEGATIONS

50.     Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

51.     Plaintiff intends to visit SCCF in the future.

52.     A female menstruates, on average, from three to five days each menstrual cycle. Menstrual cycles last, on average, 28 days each.

53.     Therefore, it is highly likely that Plaintiff will visit SCCF while menstruating in the future. Plaintiff fears future, repeated violations of her constitutional rights should she choose to visit SCCF while menstruating.

54.     Plaintiff should not be forced to make the intolerable choice between abstaining from visiting an inmate in prison because she is on her period and visiting the prison with the risk of being subjected to another humiliating and degrading search of her exposed genitalia. The ongoing constitutional violation and strong likelihood of future constitutional violations constitutes irreparable injury.

55.    On information and belief, Plaintiff will be harmed by the absence of a CCA policy specifically permitting feminine sanitary products.

56.    Ms. Doe is entitled to preliminary and permanent injunctive relief from the strip- or body cavity search of menstruating women conducted as a matter of course at SCCF pursuant to CCA custom.

57.    An injunction requiring Defendants comply with minimal Fourth Amendment standards would not cause them excessive injury or any irreparable harm. The public interest favors the grant of injunctive relief against Defendants.

## CLAIMS FOR RELIEF

**MONELL LIABILITY AGAINST CORRECTIONS CORPORATION OF AMERICA, ARVIL "BUTCH" CHAPMAN, JANE ROE GONZALES, AND JOHN DOE SULLIVAN (Counts I, II, III, IV, and V)**

### A.  Existence and Execution of a Practice and Custom

58.    Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

59.    Defendants created, affirmatively issued, permitted, encouraged, tolerated, and knowingly acquiesced in violating Plaintiff's rights, through the existence of an official pattern, practice, and custom of ignoring or otherwise disregarding Tennessee Department of Corrections policy and well-established Fourth Amendment jurisprudence requiring visual cavity searches of visitors to be based on reasonable suspicion. Defendant Sullivan ratified the custom, and stated that at SCCF, searches of female visitors to check whether they were menstruating is "standard." CCA's custom enjoys the force of law at SCCF.

60. Tennessee Department of Corrections promulgates written policies governing searches. The Department of Corrections issued a policy concerning strip-searches and body cavity searches of visitors in February 2014, prior to the search of Ms. Doe.

61. Tennessee Department of Corrections policy in effect on April 20, 2014 stated, in part:

> Searches of visitors, volunteers, employees, inmates, inmate housing units, and other areas of the facility shall be conducted in accordance with the procedures set forth below and in a manner which will avoid unnecessary force, embarrassment, or indignity to those whose person and/or belongings are being searched.

62. Department of Corrections policy prevented detaining a prison visitor to conduct a search unless "probable cause exists that the individual has illegal item(s) in their possession[.]"

63. Department of Corrections policy specifically contemplated strip- and visual body-cavity searches of visitors. The policy stated:

> Strip and visual body cavity searches of visitors require the prior approval of the Warden/designee based upon a finding of reasonable suspicion. The approved Authorization for Search, CR-2156, shall be completed by the staff member designated to conduct the search and returned to the Warden for filing. A copy will be provided for the person being searched.

64. CCA was deliberately indifferent to Plaintiff's constitutional rights because through its policymakers, it was aware of the official policy against conducting suspicionless strip searches and visual body cavity inspections of visitors, yet permitted such illegal searches anyway through official tolerance, acquiescence, and affirmative statements. For example, Defendant Sullivan's comments to Plaintiff demonstrate that CCA's illegal visitor search custom at SCCF was routine and standard, which is evidence of deliberate indifference to a persistent pattern of unlawful searches. Defendants Sullivan and Chapman were aware or should have been aware of the high risk that nonadherence to the constitutional standards for strip- visual-cavity searches of visitors would result in a widespread and systematic pattern of illegal searches and detentions of

11

female visitors, as well as violations of their Equal Protection and Due Process rights. CCA's unwritten custom of ignoring the Fourth Amendment and written policy resulted in damages to Plaintiff as alleged.

65. Accordingly, CCA had and continues to have a pattern and custom of disregarding Department of Corrections policy and constitutional law, and insisting that the genitals of menstruating females be routinely searched to verify their menstruation, without reasonable suspicion. CCA's pattern and custom caused Plaintiff to be searched and detained without the required justification under the Constitution. Defendants' pattern and custom is therefore the moving force behind the constitutional violations against Ms. Doe.

66. Defendants CCA, Sullivan, and Chapman authorized, approved, or knowingly acquiesced in the unconstitutional conduct.

**B. Failure to Train**

67. Defendants Sullivan, Chapman, and CCA, as the persons responsible for security at SCCF, made conscious choices not to conduct sufficient training on the official Department of Corrections policy and on the Fourth and Fourteenth Amendments, as they apply to searches of visitors. Defendant Gonzales, as head of visitation at SCCF, failed to train the CCA employees she supervises on the correct method and justification for conducting strip searches, including training on the applicable legal standards and state policy. Their failure to conduct training on visitor strip- and body-cavity searches was systematic and pervasive, as on information and belief, correctional officers were not trained at all on the February 2014 Department of Corrections policy, or received very minimal training in such a haphazard way that was so plainly insufficient and reckless, or grossly negligent, that it was a certainty that visitors would be strip-searched and be required to expose their genitals in violation of the U.S. Constitution.

68.     On information and belief, Defendants Sullivan, Gonzales, Chapman, and CCA failed to conduct training sessions, classes, seminars, courses, hypotheticals, and testing so as to prevent violations of the Constitution.

69.     On information and belief, Defendants Sullivan, Chapman, and CCA failed to inform correctional officers of the DOC policy and failed to conduct routine continuing education on the constitutional rights of visitors.

70.     Defendants Gonzales, Sullivan, Chapman, and CCA were deliberately indifferent to Plaintiff's constitutional rights by choosing to conduct insufficient training on visitor searches, when sufficient training would have prevented the violation of Plaintiff's rights.

71.     Even though Defendants Gonzales, Sullivan, Chapman, and CCA were aware or should have been aware of the state policy and of the substantially certain risk of a pattern of constitutional violations for nonadherence to the policy, they promulgated and supported a custom of noncompliance with the state policy and failed to train on the correct policy. On information and belief, Defendants Sullivan and Chapman's conscious choice and conduct in selecting and carrying out a training regime was reckless or grossly negligent to the point that future misconduct by correctional officers was almost inevitable or would certainly occur.

72.     Defendant Sullivan stated that searches of female visitors to verify their menstrual status were "standard." Therefore, Defendant Sullivan and his supervisor Defendant Chapman, as well as CCA, were on notice of a pattern of conduct that violated the Constitution. Defendants CCA's, Sullivan's, and Chapman's inadequate training program for officers was responsible for searching visitors absent constitutional safeguards and caused the type of injury Plaintiff suffered. Consequently, Defendants Garska and Herndon did not adhere to Department of Corrections policy, and adherence to state policy would have prevented Defendants Gonzales, Garska, and

Herndon from performing the unconstitutional search of Plaintiff. Defendants Sullivan and Chapman's choice not to conduct sufficient training of correctional officers, such as Garska and Roe, caused correctional officers to search Plaintiff without reasonable suspicion and to violate her rights under the Fourth and Fourteenth Amendments. On information and belief, Defendants' training program was inadequate for corrections officers tasked with screening visitors, and Defendants Gonzales, Sullivan, Chapman, and CCA chose from available alternatives to conduct little, ineffective, or no training on the constitutional rights of visitors and when it is appropriate to subject them to strip searches, which directly caused Plaintiff's injuries.

## C. **Failure to Supervise**

73. Defendants Gonzales, Sullivan, Chapman, and CCA systematically failed to supervise correctional officers tasked with conducting searches, as appropriate, of female visitors. On information and belief, they failed to take actions that would have prevented unconstitutional searches of Plaintiff, such as by ensuring that highly invasive searches such as visual body cavity searches were approved, on a case-by-case basis, by supervisors. Their failure to supervise and monitor their employees was so pervasive and complete as to constitute deliberate indifference, because it was near-certain that failing to supervise correctional officers performing high-risk duties such as strip- and body-cavity searches would result in constitutional violations. Defendants' failure to supervise correctional officers was not isolated to the particular correctional officers in Ms. Doe's case. Rather, Defendants Gonzales, Sullivan, Chapman, and CCA acted pursuant to the entrenched custom of verifying the menstruation of women claiming to be on their menstrual cycles and therefore did not check correctional officers' compliance with the constitutionally minimal requirement that strip searches be conducted according to applicable constitutional standards, such as reasonable suspicion, and to ensure that CCA's customs and

practices do not violate the constitutional rights of visitors. The risk of not adequately supervising front-line correctional officers to ensure that constitutional violations did not occur was obvious. Therefore, Defendants Gonzales, Sullivan, Chapman, and CCA ignored a pattern of abuses and knowingly chose not to adequately train correctional officers and chose not to ensure their compliance with the law and with written Tennessee state policy through wholly inadequate supervision.

74.     State policy requires that the warden or his or her designee expressly authorize strip searches and body cavity searches of visitors, based on an individualized finding of reasonable suspicion.

75.     On information and belief, neither Defendants Sullivan nor Chapman, nor any other person with authority delegated by Defendant Chapman, found reasonable suspicion to be present in Ms. Doe's case.

76.     On information and belief, neither Defendant Sullivan nor Defendant Chapman— nor any other person designated by Defendant Chapman—provided written approval for the search of Plaintiff.

77.     Defendants Sullivan and Chapman deliberately turned a blind eye to ongoing constitutional violations by not adhering to state policy and by not requiring approval for strip- or body cavity searches.

78.     Correctional officers' performance of strip- and body cavity searches occurred with constitutionally inadequate supervision.

79.     Defendants Sullivan and Chapman chose a supervision program of not insisting that they authorize strip- and body cavity searches from among several alternatives—including the alternative endorsed by state policy requiring warden or designee approval. On information and

belief, they failed to question officers on the frequency of strip- and body cavity searches and the justifications for strip- and body cavity searches.

80.     The consequences of Defendants' failure to supervise were plainly obvious and known to Defendants, and Defendants' deliberate conduct, which involved not even the most minimal supervision, allowed pervasive violations of the law.

81.     The existence of Defendants' official practice, pattern, and custom was the moving force of Defendants' violation of Plaintiff's constitutional rights.

### COUNT I
### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### UNCONSTITUTIONAL SEARCH
### (42 U.S.C. § 1983)
### (Against All Defendants)

82.     Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

83.     Defendants violated the Fourth Amendment's prohibition on unreasonable searches by conducting a body cavity or strip-search of Plaintiff without reasonable suspicion and/or by failing to intervene to halt and prevent unconstitutional conduct. Rather, they supported and actively assisted in the search and protected the scene of the unconstitutional search, exposing Plaintiff to a humiliating and degrading violation of her constitutional rights.

84.     On information and belief, Defendants Garska and Qualls violated the Fourth Amendment's prohibition against unreasonable searches by conducting a body cavity or strip-search of Plaintiff without reasonable suspicion.

85.     Defendants Chapman, Sullivan, Gonzales, and CCA violated Plaintiff's constitutional rights by enforcing a custom of ignoring state policy concerning visitor strip-

searches, by failing to adequately train employees on the policy, and by failing to adequately supervise CCA employees.

86. Plaintiff suffered injuries, including, but not limited to, violations of her constitutional rights, loss of liberty, humiliation, shame, fear, and extreme emotional distress as a direct and proximate result of Defendants' illegal actions.

## COUNT II
### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### SUBSTANTIVE DUE PROCESS
### (42 U.S.C. § 1983)
### (Against All Defendants)

87. Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

88. Plaintiff enjoyed the fundamental right to personal security, privacy, and bodily integrity.

89. Defendants violated Plaintiff's Fourteenth Amendment substantive due process rights to personal security and bodily integrity when they arbitrarily conducted searches of Plaintiff's genitalia to verify her menstruation, or when they failed to intervene to halt or prevent the violation of Plaintiff's rights to personal security and bodily integrity.

90. Defendants Gonzales, Sullivan, Chapman, and CCA violated Plaintiff's substantive due process rights through their custom of conducting suspicionless searches of the genitals of menstruating women, their failure to conduct adequate training on visitor searches and the applicable standards governing such searches, and their failure to supervise corrections officers' conduct. Defendant Chapman failed to ensure that he or his designee approved strip-searches of visitors.

17

91.     Defendants' nonadherence to state policy also violated the process that was due to Plaintiff, because Defendants maintained a custom of disregarding the policy and conducting strip- and body cavity searches when women were suspected of menstruating.

92.     Therefore, Defendants exercised their power to conduct strip-searches without any reasonable justification and in an arbitrary and capricious manner. Defendants' insistence that menstruating women suffer a search of their genitals to verify their menstruation—not just an "ordinary" search but one that implicates women's most private affairs and may implicate reproductive considerations—was in callous disregard of Plaintiff's constitutional rights. Furthermore, Defendants' promulgation of and reliance on their custom was arbitrary and unfair, and consequently violated the Due Process Clause.

93.     Defendants' conduct was deliberately indifferent to Plaintiff's Fourteenth Amendment rights because they devised or chose to implement CCA's custom in a way that shocks the conscience and from among alternative courses of action.

94.     Plaintiff suffered injuries, including, but not limited to, violations of her constitutional rights, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate result of Defendants' illegal actions.

## COUNT III
### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### EQUAL PROTECTION OF THE LAW
### (42 U.S.C. § 1983)
### (Against All Defendants)

95.     Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

96.     Plaintiff is a woman.

97.     Gender is a quasi-suspect class.

98. CCA's policy at SCCF distinguishes between men and women in several ways. For example, both men and women have the biological capacity to smuggle contraband into SCCF through body orifices.

99. Defendants' custom, practice, and behavior of classifying women into a category singled out for additional, humiliating genital searches is not substantially related to an important government interest.

100. Women and men bear the burdens of CCA's custom unequally. Defendants have discriminated against Plaintiff based on her gender.

101. Pursuant to CCA's custom of requiring menstruating female visitors to demonstrate their menstruation to CCA employees, Defendants treated Plaintiff unequally without an important government interest in doing so.

102. Male visitors are not required to show their genitalia absent reasonable suspicion.

103. Plaintiff volunteered to replace her feminine sanitary napkin. The replacement of Plaintiff's hygiene pad should have obviated the need for inspection of her exposed genitalia absent reasonable suspicion of criminal activity.

104. No important government interest existed for Plaintiff to demonstrate to Defendants that she was, in fact, menstruating after being given a replacement, institutional hygiene pad, and Defendants failed to implement their custom in a way that was substantially related to the government's interest.

105. Defendants Herndon and Roe violated the Fourteenth Amendment by standing outside the bathroom door "guarding" where Ms. Doe was being searched, with knowledge that Defendant Garska was searching Ms. Doe's genitalia through the application of a custom that violates equal protection of the laws and unlawfully singles out women, and by failing to intervene

to halt and prevent unconstitutional conduct. Rather, they supported and actively assisted in protecting the scene of the unconstitutional search and unconstitutional discrimination, exposing Plaintiff to a humiliating and degrading violation of her constitutional rights. Defendant Qualls stood in the bathroom, ostensibly as a female "witness" for Defendant Garska. Defendant Qualls failed to intervene to prevent or halt the discriminatory conduct, and in fact, allowed it to proceed.

106.    Plaintiff suffered injuries, including, but not limited to, discrimination, violations of her constitutional rights, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate result of Defendants' illegal actions.

**COUNT IV**
**VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS**
**TO THE UNITED STATES CONSTITUTION**
**UNCONSTITUTIONAL SEIZURE**
**(42 U.S.C. § 1983)**
**(Against All Defendants)**

107.    Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

108.    The Fourth Amendment to the United States Constitution guards against unreasonable seizures.

109.    Defendants Herndon and Garska restricted Plaintiff's freedom of movement by isolating her from the SCCF checkpoint, ordering her to sit in a certain location, and by Defendant Garska stating words to the effect of, "We'll have to see," and then isolating Plaintiff from the rest of the visitation area in a vacant bathroom, effectively confining her.

110.    Based on the totality of the circumstances surrounding Defendants' detention of Plaintiff, a reasonable person would not have felt free to leave. In fact, Plaintiff did not feel free to leave.

111.     Plaintiff did not consent to the detention. CCA's visitation policy prevented Plaintiff from having the option to consent to the detention. Faced with the possibility of permanent suspension of visitation, she could not freely, knowingly, or intelligently consent to a detention for the purpose of yielding to a strip-search or body cavity search.

112.     Defendants Roe and Garska seized Plaintiff when they physically isolated her from the checkpoint, performed a patdown or frisk, and then commanded Plaintiff to sit in a specific place.

113.     Defendants lacked reasonable suspicion to detain Plaintiff.

114.     Defendants Roe, Herndon, Garska, and Qualls detained Plaintiff, or acquiesced in the detention of Plaintiff by failing to halt or prevent the detention, by facilitating and/or conducting the detention necessary for Defendant Garska to observe Plaintiff's unclothed pubic area.

115.     Defendants, through their individual conduct and by implementation of this custom, policy, or practice, and by failing to train and supervise, violated Plaintiff's right to be free from unreasonable seizures.

116.     Plaintiff suffered injuries, including, but not limited to, violations of her constitutional rights, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate result of Defendants' illegal actions.

**COUNT V**
**VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**PROCEDURAL DUE PROCESS**
**(Against All Defendants)**

117.     Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

118. Plaintiff had and has a fundamental liberty interest in bodily integrity, personal autonomy, equal protection of the law, and to be free from unreasonable searches and seizures.

119. Furthermore, State of Tennessee procedures provided Plaintiff with a liberty interest in avoiding capricious searches of her genitalia.

120. The State of Tennessee's policies use mandatory language which dictates a particular outcome. Plaintiff relied on this regulatory scheme to protect her privacy rights.

121. Tennessee's procedures were designed to protect the bodily integrity and personal dignitary rights of visitors.

122. Defendants violated Plaintiff's procedural due process rights by failing to afford the process that was due to her, as Defendant Chapman or his designee did not approve the strip-search of Plaintiff before the search occurred, the required paperwork was not generated, and Defendants failed to provide Plaintiff with a copy of required paperwork, and/or by failing to intervene to prevent violation of Plaintiff's due process rights by requiring Defendants Garska and Qualls to adhere to the process due to Plaintiff.

123. There existed no adequate pre-deprivation remedy for Plaintiff to vindicate the imminent violation of her rights.

124. Defendants authorized and ratified the unconstitutional conduct, and Defendant Sullivan told Plaintiff that suspicionless searches of women's genitals to verify that they were menstruating was standard at SCCF. On information and belief, Defendant Chapman failed to supervise and train his officers and abused his authority to approve strip-searches of visitors by granting broad, uncircumscribed powers to his subordinates, allowing for widespread constitutional violations.

22

125.    Plaintiff suffered damages as a direct and proximate result of Defendants' unlawful conduct, including, but not limited to, violations of her constitutional rights, loss of liberty, humiliation, shame, fear, and emotional distress.

### COUNT VI
### INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

126.    Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

127.    Defendants, in operating a prison and allowing visitors such as Plaintiff, owed Plaintiff a duty of reasonable care to protect their visitors from harm.

128.    Defendants' conduct in requiring her to undergo an inspection of her menstruating genitalia had no legitimate law enforcement purpose and constituted outrageous conduct, which should not be tolerated in civilized society.

129.    By detaining and then searching Plaintiff in a degrading and humiliating manner, it was reasonably foreseeable that Plaintiff would suffer severe or serious mental and emotional injury. Defendants' custom made the harm Plaintiff suffered a near certainty.

130.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered and continues to suffer from severe or serious mental and emotional injury.

131.    Defendants' conduct was intentional, reckless, or negligent.

132.    Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

## NEGLIGENCE
### (Against All Defendants)

133.    Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

134.    Defendants, in operating a prison and allowing visitors such as Plaintiff, owed Plaintiff a duty of reasonable care to protect their visitors from harm.

135.    Defendants Sullivan, Chapman, and CCA, by ratifying and promulgating a custom of nonadherence to state strip-search policy and ignoring the substantive requirements of the state policy, which protects the rights of visitors, and by failing to supervise and train correctional officers, breached their duty of reasonable care.

136.    On information and belief, Defendants Garska, Qualls, and Roe, by detaining and suffering Plaintiff to undergo an invasive, humiliating search, breached their duty of due care to Plaintiff.

137.    It was foreseeable that the supervisors' and correctional officers' conduct would lead to Plaintiff suffering harm, including loss of dignity, humiliation, shame, emotional distress, and fear.

138.    Defendants' conduct was the direct and proximate cause of Plaintiff's injury.

139.    Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

## COUNT VIII
### ASSAULT
### (Against Defendants Garska and CCA)

140.    Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

141.    Defendants acted devoid of any legitimate law enforcement purpose, as the suspicionless and arbitrary search of all menstruating visitors is not contemplated by our laws or the Constitution.

142.    Defendant Garska, by peering onto Plaintiff's unclothed pubic area and moving closer to determine if Plaintiff was, in fact, menstruating, frightened Plaintiff and placed her in apprehension of harm or offensive contact.

143.    Defendant CCA conformed to a custom of permitting its female visitors to be in fear of imminent harm or fear by subjecting them to suspicionless cavity inspections.

144.    It was foreseeable that Defendants' conduct toward Plaintiff would place her in imminent fear.

145.    Defendants' conduct was intentional.

146.    Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

147.    Plaintiff suffered injuries, including, but not limited to, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate cause of Defendants' illegal actions.

## COUNT IX
### INVASION OF PRIVACY
### (Against All Defendants)

148.    Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

149.    A woman's unclothed pubic area is one of her most intimate and private places, affairs or concerns.

150.    Defendants searched Plaintiff's genitals to verify that she was menstruating, or facilitated or arranged for the search of Plaintiff. Defendants' conduct occurred without any suspicion or legitimate law enforcement purpose.

151.    Defendants physically or otherwise invaded the seclusion and privacy of Plaintiff's body.

152.    Defendant Chapman, as warden, and on behalf of CCA, cooperated with Defendant Sullivan to ensure that all women suspected of menstruating should be searched.

153.    All Defendants acted intentionally, with the desire that they invade Plaintiff's privacy. Defendants' conduct is highly offensive to a reasonable person. A reasonable woman in Plaintiff's position would strongly object to Defendants' conduct.

154.    Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

155.    Plaintiff suffered injuries, including, but not limited to, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate result of Defendants' illegal actions.

## COUNT X
### FALSE IMPRISONMENT
### (Against All Defendants)

156.     Plaintiff re-alleges and re-avers the preceding paragraphs, and the preceding are incorporated herein by reference.

157.     Defendants intentionally restrained or detained Plaintiff, against her will, in order to effectuate a search of her pubic area.

158.     Defendants lacked any lawful reason for detaining Plaintiff.

159.     Defendants Sullivan, Chapman, and CCA cooperated to falsely imprison Plaintiff, as they formulated and enacted a custom of searching the pubic areas of all female visitors suspected of being on their menstrual cycles. Defendant Gonzales, as head of visitation, failed to train and supervise CCA employees working under her control to ensure compliance with the law, and therefore cooperated with the other Defendants to violate Plaintiff's right to be free from false imprisonment.

160.     Plaintiff was detained against her will so that she could be searched, without reasonable suspicion or other legitimate law enforcement purpose.

161.     Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

162.     Plaintiff suffered injuries, including, but not limited to, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate cause of Defendants' illegal actions.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiff requests judgment for Plaintiff and against all Defendants as so follows:

(1)     Plaintiff requests that the Court grant her motion for protective order and permit her to continue in this action pseudonymously;

(2)     Plaintiff requests that she be awarded all damages to which it may appear she is entitled by the proof submitted in this cause, including compensatory damages and emotional distress damages;

(3)     Plaintiff requests that she be awarded punitive damages against all Defendants because they acted with evil motive or intent or with callous indifference to Plaintiff's federally protected rights;

(4)     Plaintiff requests the Court enter declaratory judgment holding that Defendants' conduct, practice, and custom is in violation of Plaintiff's federally protected rights;

(5)     Plaintiff requests an injunction requiring Defendants to conduct strip searches and body cavity searches of visitors in compliance with the law;

(6)     Plaintiff requests a trial by jury in all claims so triable.

(7)     Plaintiff requests that she be awarded reasonable expenses in this litigation, including reasonable attorney and expert fees and costs, pursuant to 42 U.S.C. § 1988;

(8)     Plaintiff requests that she receive all further and general relief to which it may appear she is entitled, the interests of justice demanding it.

Dated: January 22, 2015

Respectfully submitted,

Tricia Herzfeld (BPR No. 26014)
Elliott Ozment (BPR No. 4331)
William P. York II (BPR No. 30546)
OZMENT LAW
1214 Murfreesboro Pike
Nashville, TN 37217
(615) 321-8888 (office)
(615) 321-5230 (fax)
tricia@ozmentlaw.com
elliott@ozmentlaw.com
will@ozmentlaw.com

*Attorneys for Plaintiff*