**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| **JANE DOE #1**; JANE DOE #2; and JANE DOE #3, on behalf of herself and as next friend of MINOR DOE #1, MINOR DOE #2, and MINOR DOE #3, <br><br> *Plaintiffs*, <br><br> v. <br><br> **CORRECTIONS CORPORATION OF AMERICA**; ARVIL "BUTCH" CHAPMAN, in his individual capacity and in his official capacity as warden of the South Central Correctional Facility; DANIEL SULLIVAN, in his individual capacity and in his official capacity as chief of security of the South Central Correctional Facility; KELLY J. GARSKA, in her individual and official capacities; MIA W. QUALLS, in her individual and official capacities; GINA J. GONZALES, in her individual and official capacities; FELICIA D. ROACH, in her individual and official capacities; MERCEDES JONES, in her individual and official capacities; DEBRA ROBERTS CORNWALL, in her individual and official capacities; and TRINITY SERVICES GROUP, INC., <br><br> *Defendants*. | Case No. 3:15-cv-68 <br><br> Judge Campbell <br> Magistrate Judge Knowles <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> JURY DEMAND |

**THIRD AMENDED COMPLAINT
FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF**

COME NOW Plaintiffs Jane Doe #1, Jane Doe #2, and Jane Doe #3, on behalf of herself and as next friend of Minor Doe #1, Minor Doe #2, and Minor Doe #3, by and through their undersigned counsel, and state as follows for their Third Amended Complaint:

1

## INTRODUCTION

1.     This is an action to vindicate visitors' constitutional rights related to a troubling and unconstitutional pattern of invasive and humiliating seizures and searches at the South Central Correctional Facility ("SCCF") in Clifton, Tennessee, a prison privately managed by Corrections Corporation of America ("CCA"). Despite the absence of any individualized suspicion, Defendants, through their acts and omissions and pursuant to a custom carrying the force of law, required Plaintiffs to expose their unclothed genitalia to corrections officers to "verify" that they were menstruating. Corrections officers forced Jane Doe #3's three children to witness the degrading and debasing search of their mother. Defendants' conduct deprived Plaintiffs of their constitutional rights to be free from unreasonable search and seizure, equal protection of the laws, and the right against deprivation of liberty and privacy without due process of law. Defendants' conduct also violated the laws of the State of Tennessee. This lawsuit seeks to have Defendants' strip-search policy declared unconstitutional and enjoined. This lawsuit also seeks compensatory damages and punitive damages for Defendants' unconscionable and callous disregard of Plaintiffs' rights.

## PARTIES

2.     Plaintiff **Jane Doe #1** is a living, natural person and resident of Tennessee and of this judicial District. The name "Jane Doe #1" is a fictitious pseudonym.[1] At the times relevant to this her Complaint, Plaintiff was a <u>visitor</u> at the South Central Correctional Facility.

---

[1]     The Court has permitted Jane Doe #1 to proceed in this action under a pseudonym, and the Court has granted her motion for a protective order protecting her true identity from public disclosure. (*See* Doc. 11).

3.     Plaintiff **Jane Doe #2** is a living, natural person and resident of Tennessee and of this judicial District. The name "Jane Doe #2" is a fictitious pseudonym. Because of the extremely humiliating and embarrassing nature of the facts alleged in her Complaint, Plaintiff has filed a Motion for Protective Order, (Doc. 13), and a memorandum of law in support thereof, (Doc. 14), which would permit her to proceed under the pseudonym "Jane Doe," with her true name and identity being disclosed to the Court and Defendants under seal but protected from public disclosure. Public knowledge of the harm Plaintiff suffered would bring additional embarrassment, shame, and scorn upon her. At the times relevant to this her Complaint, Plaintiff was a <u>visitor</u> at the South Central Correctional Facility.

4.     Plaintiff **Jane Doe #3** is a living, natural person and resident of Tennessee. The name "Jane Doe #3" is a fictitious pseudonym. Because of the extremely humiliating and embarrassing nature of the facts alleged in her Complaint, Plaintiff has filed a Motion for Protective Order, (Doc. 13), and a memorandum of law in support thereof, (Doc. 14), which would permit her to proceed under the pseudonym "Jane Doe," with her true name and identity being disclosed to the Court and Defendants under seal but protected from public disclosure. Public knowledge of the harm Plaintiff suffered would bring additional embarrassment, shame, and scorn upon her. Plaintiff is of the full age of majority and the legal guardian and next friend of Minor Doe #1, Minor Doe #2, and Minor Doe #3. At the times relevant to this her Complaint, Plaintiff was a <u>visitor</u> at the South Central Correctional Facility.[2]

5.     Plaintiff **Minor Doe #1** is a living, natural person and minor child under the age of 18 years and resident of Tennessee. The name "Minor Doe #1" is a fictitious

---

[2]     Plaintiffs Jane Does #1-3, are hereinafter collectively referred to as the "Women Plaintiffs."

pseudonym. At all times relevant to Plaintiff's Complaint, Minor Doe #1 was 16 years old. Because of the extremely humiliating and embarrassing nature of the facts alleged in Doe's Complaint, Plaintiff has filed a Motion for Protective Order, (Doc. 13), and a memorandum of law in support thereof, (Doc. 14), which would permit Doe to proceed under the pseudonym "Minor Doe #1," with the child's true name and identity being disclosed to the Court and Defendants under seal but protected from public disclosure. As a child, Plaintiff is particularly susceptible and vulnerable to public contempt and scorn. Public knowledge of the harm Plaintiff suffered would bring additional embarrassment, shame, and scorn upon Minor Doe. At all times relevant to Minor Doe #1's Complaint, Minor Doe accompanied Jane Doe #3 and was a <u>visitor</u> at SCCF.

6.      Plaintiff **Minor Doe #2** is a living, natural person and minor child under the age of 18 years and resident of Tennessee. The name "Minor Doe #2" is a fictitious pseudonym. At all times relevant to Plaintiff's Complaint, Minor Doe #2 was 5 years old. Because of the extremely humiliating and embarrassing nature of the facts alleged in Doe's Complaint, Plaintiff has filed a Motion for Protective Order, (Doc. 13), and a memorandum of law in support thereof, (Doc. 14), which would permit Doe to proceed under the pseudonym "Minor Doe #2," with the child's true name and identity being disclosed to the Court and Defendants under seal but protected from public disclosure. Public knowledge of the harm Plaintiff suffered would bring additional embarrassment, shame, and scorn upon Minor Doe. As a very young child, Plaintiff is particularly susceptible and vulnerable to public contempt and scorn. At all times relevant to Minor Doe #2's Complaint, Minor Doe accompanied Jane Doe #3 and was a <u>visitor</u> at SCCF.

4

7.     Plaintiff **Minor Doe #3** is a living, natural person and minor child under the age of 18 years. The name "Minor Doe #3" is a fictitious pseudonym. At all times relevant to Plaintiff's Complaint, Minor Doe #3 was 3 years old. Because of the extremely humiliating and embarrassing nature of the facts alleged in Doe's Complaint, Plaintiff has filed a Motion for Protective Order, (Doc. 13), and a memorandum of law in support thereof, (Doc. 14), which would permit Doe to proceed under the pseudonym "Minor Doe #3," with the child's true name and identity being disclosed to the Court and Defendants under seal but protected from public disclosure. As a child, Plaintiff is particularly susceptible and vulnerable to public contempt and scorn. Public knowledge of the harm Plaintiff suffered would bring additional embarrassment, shame, and scorn upon Minor Doe. At all times relevant to Minor Doe #3's Complaint, Minor Doe accompanied Jane Doe #3 and was a <u>visitor</u> at SCCF.[3]

8.     Defendant **Corrections Corporation of America** is a Maryland corporation headquartered in Tennessee, with its principal place of business at 10 Burton Hills Boulevard, Nashville, Tennessee. CCA is a for-profit, publicly traded (NYSE: CXW) real estate investment trust that "specializes in owning, operating and managing prisons and other correctional facilities" and has referred to itself as "the nation's largest owner of partnership correction and detention facilities and one of the largest prison operators in the United States." CCA's website boasts that the corporation operates more than 60 detention facilities, jails, and prisons holding more than 90,000 beds. CCA operates SCCF under the full authority of the State of Tennessee pursuant to Tenn. Code Ann. §§ 41-24-101, *et seq.*, and/or 41-8-101, *et seq.* At all times relevant to Plaintiff's Complaint, CCA was acting

---

[3]     Plaintiff Minor Does #1-3 are hereinafter collectively referred to as the Child Plaintiffs.

under color of state law. CCA is the entity charged by the State of Tennessee with authority to maintain the SCCF and has a non-delegable duty to ensure that all visitors are protected by the Constitutions and laws of the United States and the State of Tennessee. Defendant CCA is responsible for the implementation of policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this action. CCA is licensed to do business in Tennessee and may be served through its registered agent, CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

9.     Defendant **Arvil "Butch" Chapman** is believed to be a resident of Tennessee. Defendant Chapman is the warden of the South Central Correctional Facility in Clifton, Tennessee. As such he is the chief executive officer of SCCF and exercises plenary authority over all SCCF staff. At all times relevant to Plaintiff's Complaint, Defendant Chapman was acting under color of state law. Defendant Chapman is sued in his official capacity as warden of SCCF and in his individual capacity.

10.     Defendant **Daniel Sullivan** is believed to be a CCA employee. On information and belief, Defendant Sullivan was at all times relevant to this Complaint the chief of security at CCA's SCCF. On information and belief, Defendant Chapman, as warden, delegated responsibility for prison security to Defendant Sullivan. At all times relevant to Plaintiff's Complaint, Defendant Sullivan was acting under color of state law. Defendant Sullivan is sued in his official and individual capacities.

11.     Defendant **Kelly J. Garska** is believed to be a resident of Tennessee. Defendant Garska is a correctional officer or guard at the South Central Correctional Facility. At all times relevant to Plaintiff's Complaint, Officer Garska was acting under color of state law. Defendant Garska is sued in her official and individual capacities.

6

12.     Defendant **Mia W. Qualls** is believed to be a resident of Tennessee. Defendant Qualls is a correctional officer or guard at the South Central Correctional Facility. At all times relevant to Plaintiff's Complaint, Officer Qualls was acting under color of state law. Defendant Qualls is sued in her official and individual capacities.

13.     Defendant **Gina J. Gonzales** is believed to be a resident of Tennessee. Defendant Gonzales is a CCA employee, who, upon information and belief, was, at all times relevant to Plaintiffs' Complaint, in charge of visitation at SCCF under the direction and control of Defendants Sullivan, Chapman, and CCA. At all times relevant to Plaintiff's Complaint, Defendant Gina Gonzales was acting under color of state law. Defendant Gonzales is sued in her official and individual capacities.

14.     Defendant **Felicia Roach** is believed to be a resident of Tennessee. Defendant Roach is a correctional officer or guard at the South Central Correctional Facility. At all times relevant to Plaintiffs' Complaint, Officer Roach was acting under color of state law. Defendant Roach is sued in her official and individual capacities.

15.     Defendant **Mercedes Jones** is believed to be a resident of Tennessee. Defendant Jones is believed to be a correctional officer or guard at the South Central Correctional Facility. At all times relevant to Plaintiffs' Complaint, Defendant Jones was acting under color of state law. Mercedes Jones is sued in her official and individual capacities.

16.     Defendant **Debra Roberts Cornwall** is believed to be a resident of Tennessee who worked at SCCF. On information and belief, Defendant Cornwall is employed by Defendant Trinity Services Group, Inc., which conducts business as a contractor at SCCF. At all times relevant to Plaintiffs' Complaint, Defendant Roberts

7

Cornwall was acting under color of state law. Debra Roberts Cornwall is sued in her official and individual capacities.

17. Defendant **Trinity Services Group, Inc.**, is a Florida corporation headquartered in Florida, with its principal place of business at 477 Commerce Blvd., Oldsmar, Florida. Defendant Trinity Services Group, Inc., describes itself as "one of the largest providers of correctional food service in the nation," according to its website. Defendant employees more than 3,000 persons and serves "nearly 300,000 inmates daily in 33 states, Puerto Rico and the U.S. Virgin Islands." At all times relevant to Plaintiff's Complaint, Trinity Services Group, Inc., was acting under color of state law. Trinity Services Group, Inc., is licensed to do business in Tennessee and may be served through its registered agent, CT Corporation System, 800 South Gay Street, Suite 2021, Knoxville, Tennessee 37929-9710.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367. Injunctive relief is authorized by Fed. R. Civ. P. 65. Declaratory relief is authorized by 28 U.S.C. §§ 2201-2202.

19. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant CCA is a resident of this District, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## FACTUAL ALLEGATIONS

### A. Facts Involving Jane Doe #1

20. On April 20, 2014, Plaintiff Jane Doe #1 traveled to SCCF to visit an inmate, which had been approved by Defendant CCA, as she had done many times before.

21.     Plaintiff was an authorized visitor at South Central Correctional Facility on April 20, 2014.

22.     Plaintiff, a woman of childbearing age, was having her menstrual cycle at the time of her April 20, 2014 visit.

23.     Ms. Doe underwent security screening at SCCF. At approximately 8:43 a.m., Plaintiff cleared the first checkpoint.

24.     At another security checkpoint on the way to conduct her visitation, Defendant Garska inquired about Ms. Doe's feminine sanitary napkin, which Plaintiff left visible protruding out of her pocket.

25.     Plaintiff informed corrections officer Defendant Garska and a male corrections officer that she was menstruating and asked the officers what CCA's policy was for feminine hygiene products. Plaintiff voluntarily removed the wrapped sanitary napkin and placed it on the desk to show Defendant Garska. Officer Garska Responded that SCCF would have to give Plaintiff a CCA-approved sanitary napkin.

26.     Then, Defendant Garska said words to the effect of, "But I'll have to make sure you are."

27.     Defendant Garska then repeated words to the effect of, "We have to make sure you are actually—."

28.     Plaintiff asked Defendant Garska how the CCA officers intended to verify that she was menstruating.

29.     Defendant Garksa responded, "We'll have to see."

Case 3:15-cv-00068   Document 51   Filed 04/16/15   Page 9 of 52 PageID #: 440

30.     Then, Defendant Garska isolated Plaintiff from the metal detector checkpoint area and took her to a vacant restroom, where she conducted a pat-down frisk of Plaintiff's body. Defendant found no contraband.

31.     After Ms. Doe cleared the pat-down search, Defendant Garska commanded Plaintiff to put her shoes back on and sit in a certain spot.

32.     Fearful that Defendant Garska's comments meant that she would have to somehow provide proof of her menses, Plaintiff asked Defendant Garska which CCA, Tennessee Corrections Institute, or Department of Correction policy authorized her conduct. Defendant never responded, nor did the male corrections officer present during the encounter.

33.     SCCF's visitor policy at all times relevant to this action stated, *inter alia*:

> [S]hould you refuse to consent to the search of your personal vehicle or attempt to evade/flee without being searched, your visitation privileges may be permanently suspended from any CCA/TDOC Facility.

and

> Any visitor refusing a search of any type may be permanently restricted from visiting at any TDOC facility.

34.     Plaintiff offered Defendant Garska several options that would have demonstrated that she was, in fact, menstruating, in lieu of undergoing a full-fledged search of her genitals. Plaintiff was fearful that she may have to expose her genitalia to strangers.

35.     For example, Plaintiff offered to simply leave SCCF altogether or cut short her visit should she need to use the restroom and replace her sanitary napkin. Plaintiff offered to urinate in a toilet—without flushing—and then allow the Defendant correction officer to see the toilet bowl containing her urine and uterine blood. Plaintiff also offered

to change her sanitary or "maxi" pad and show the officers the pad containing her menstrual blood in the trash.

36.     Defendant Garska refused all of Plaintiff's requests for accommodation.

37.     Defendant Garska used her radio to call for a female correctional officer.

38.     Later, a female correctional officer, Defendant Qualls, arrived and asked Plaintiff, "What's going on?"

39.     Plaintiff responded that she was on her period.

40.     Defendant Qualls said, "Oh great," in a sarcastic tone of voice, and immediately walked into a women's restroom at SCCF.

41.     Plaintiff entered the restroom, still asking what she was supposed to do.

42.     Defendant Garska said, "Show me."

43.     Defendant Garska stood directly in front of Plaintiff, and Defendant Qualls stood near the door of the restroom. A male correctional officer remained outside the door.

44.     Plaintiff asked Defendant Garska words to the effect of, "What do you want me to do?"

45.     Defendant Garska replied, "What do you think? Show me!"

46.     Plaintiff pulled her pants and underwear down, exposing her genitalia. Defendant Garska visually inspected Plaintiff's exposed genitalia and looked upon her vaginal area. Defendant Garska positioned herself so that her eyes were approximately level with Plaintiff's hips and unclothed pelvic area.

47.     After Defendant Garska was satisfied that Plaintiff was menstruating, Ms. Doe was permitted to raise her pants and exit the prison's visitation-area restroom.

48.     Defendants then permitted Plaintiff to proceed with her visitation.

49.     Plaintiff had never been suspected of attempting to smuggle or otherwise bring contraband into SCCF or any other correctional facility, or of any other misconduct involving a correctional facility.

50.     After the completion of her visit at SCCF, Plaintiff telephoned the facility to inquire about the policy, fearful of a similar search occurring in the future should she choose to visit SCCF while on her menstrual cycle.

51.     Plaintiff spoke with Defendant Sullivan, CCA's chief of security at SCCF.

52.     Plaintiff said to Defendant Sullivan, "Please explain to me … the standard procedure and policy for [a] female visitor that comes to visit when she's on her menstrual cycle?" Defendant Sullivan stated that he was "busy" and asked her to "cut to the chase."

53.     Plaintiff said, "For any reason, should a female visitor be asked to remove her pants and underwear for a search?" Defendant Sullivan responded, "Yes."

54.     Plaintiff followed up, "That's standard?" Defendant Sullivan said, "Mmmhmm."

55.     Plaintiff continued, "To prove she's on her menstrual cycle?" Defendant Sullivan said, "Yes."

56.     Plaintiff asked, "That is standard?" Defendant Sullivan said, "Yes."

**B.  Facts Involving Jane Doe #2**

57.     On or about May 11, 2014, Plaintiff Jane Doe #2, a grandmother, traveled from her Middle Tennessee home to SCCF in Clifton, Tennessee, to visit an inmate, as she had done many times before.

58.     Plaintiff was an approved visitor at SCCF.

59.     Plaintiff was on her menstrual cycle at the time of her visit and was wearing a sanitary napkin.

60.     Plaintiff brought her ID cards, her keys, and a sealed feminine sanitary napkin to SCCF with her.

61.     Plaintiff passed SCCF's metal detector checkpoint without incident.

62.     Plaintiff placed her belongings in a small container for holding visitors' personal property.

63.     The container holding Plaintiff's ID, keys, and sealed sanitary napkin was put through CCA's x-ray machine.

64.     After Plaintiff's effects passed through the x-ray machine, Defendant Gonzales, who was standing near the x-ray screening area, pointed to Plaintiff's wrapped sanitary napkin and said words to the effect of, "You can't take this in here."

65.     Plaintiff responded with words to the effect of, "Why?" I'm on –"

66.      "No! You have to change in front of us," Defendant Gonzales interrupted.

67.     Defendant Gonzales ordered Plaintiff into the visitation-area restroom, where another officer, Defendant Debra Roberts Cornwall, conducted a pat-down or frisk search of Plaintiff's body.

68.     The officer who performed the search of Plaintiff's body exited the restroom, and Defendant Gonzales entered.

69.     Defendant Gonzales said words to the effect of, "You have to change your pad in front of us."

70.     Plaintiff protested that Defendant Gonzales's command was outrageous.

71.     Defendant Gonzales then responded with words to the effect of, "It's company policy. It's not my rule, you have to do it."

72.     Defendant Gonzales continued, "I don't make the rules, I just enforce them."

73.     Still not believing what Defendant Gonzales was requiring of her, Plaintiff said words to the effect of, "What am I supposed to do?"

74.     Defendant Gonzales reiterated words to the effect of, "You have to change it in front of us."

75.     Defendant Gonzales stood 2-3 feet from Plaintiff as Plaintiff squatted and lowered her pants and underwear, exposing her menstruating genitals to Defendant Gonzales.

76.     Plaintiff then removed her obviously bloody sanitary napkin and held it up for Gonzales's inspection.

77.     Defendant Gonzales said words to the effect of, "I don't want to see it, that's all."

78.     Plaintiff then applied the menstrual pad she brought to SCCF.

79.     Plaintiff threw her soiled pad in the restroom's trash bin, washed her hands, and exited the restroom, embarrassed and humiliated.

80.     Defendant Gonzales then told Plaintiff that if she needed to change her sanitary napkin again, CCA would provide one.

81.     Neither Defendants Roberts Cornwall, Gonzales, nor any other correctional officer asked to examine Plaintiff's soiled or new, commercially bought sanitary napkins.

82. Plaintiff did not feel free to leave before and during Defendants' search of her genitalia.

83. Defendants possessed no reasonable suspicion to justify their detention and search of Plaintiff's body.

84. Defendant Roberts Cornwall assisted Defendant Gonzales with the search.

85. Plaintiff proceeded with her visit and left the facility, not returning for many months in fear of having to expose her genitals once more to strangers. Plaintiff was anxious of the grave probability of future humiliation, fear, and embarrassment of exposing something so private to others. Defendant Chapman or his designee, while on notice of the custom of searching menstruating females in this manner, did not specifically approve the search of Plaintiff in this instance.

86. No CCA employee, agent, or contractor gave Plaintiff Doe #2 a form memorializing the search.

87. However, CCA employees wrote in a logbook that Defendant Gonzales searched Plaintiff "due to her having pads on her person." The CCA employees wrote that Defendant Roberts Cornwall was present and assisted Defendant Gonzales.

**C. Facts Involving Jane Doe #3 and Minor Does #1-3**

*First Visit: March 2014*

88. On or about March 8, 2014, Plaintiff Jane Doe #3 traveled from her Tennessee home to SCCF to visit an inmate, as she had done many times before.

89. Ms. Doe #3 was an approved visitor at SCCF.

90. Plaintiff was on her menstrual cycle at the time of her March 2014 visit.

91.     Plaintiff held two wrapped tampons in her hand as she entered SCCF's security clearance.

92.     Defendant Corrections Officer Garska, a CCA employee at the security checkpoint, asked Plaintiff what was in her hand. Plaintiff responded that she had two tampons. Defendant Garska said she had to call Defendant Gonzales.

93.     On information and belief, Defendant Garska spoke on the telephone with Defendant Gonzales.

94.     After conferring with Defendant Gonzales, Defendant Garska told Plaintiff that a "new policy" prevented women from bringing tampons with them to visit at SCCF.

95.     Defendant Garska further said that under the new policy, a CCA officer would have to go into the restroom with Plaintiff and that Plaintiff would have to remove the tampon she was wearing and replace it with a CCA "pad" or sanitary napkin.

96.     Defendant Corrections Officer Roach told Plaintiff to step into the restroom. Defendant Roach told Plaintiff that she must remove her tampon and replace it with a CCA-approved sanitary napkin.

97.     Defendant Roach had Plaintiff lower her pants and undergarments, allowing Defendant Roach to view Plaintiff's exposed genitalia.

98.     Defendant Roach stood nearby and watched Plaintiff squat to remove her tampon.

99.     Defendant said words to the effect of, "Let me see the tampon."

100.    Plaintiff then removed her tampon by a string from her vagina while Defendant looked on.

101.    Plaintiff held her bloody tampon up for Defendant's inspection.

102.     Plaintiff then urinated in the toilet under Defendant's supervision, and Defendant peered into the toilet bowl containing Plaintiff's urine mixed with menstrual blood.

103.     Defendant then told Plaintiff she must spread her legs and squat.

104.     Plaintiff asked Defendant Roach words to the effect of, "What do you want to see?"

105.     Defendant responded with words to the effect of, "I don't want to do this, but it is policy."

106.     Plaintiff, utterly humiliated, asked Defendant, "Are you violating my rights?"

107.     Defendant said words to the effect of, "No, this is policy and procedure."

108.     Plaintiff did not feel free to leave during this encounter with Defendant.

109.     Defendant then gave Plaintiff a CCA sanitary napkin, and Plaintiff applied the napkin.

110.     Defendant then performed a pat-down search of Plaintiff's body and permitted her to commence her visit.

111.     During her visit, Plaintiff felt the need to urinate and to change her sanitary napkin. The usual practice was that visitors could use the restroom in SCCF's visitation area. Other persons were allowed to use the visitation-area restroom that day. However, CCA employees required that Plaintiff return to the restroom where she had been searched.

112.     Defendant Roach entered the restroom and required Plaintiff to change the pad in her presence.

113.     Defendant also watched Plaintiff as she urinated.

114.    After Plaintiff changed her pad but before leaving the restroom, Defendant insisted she must inspect Plaintiff's vulva once more.

115.    Defendant positioned herself so that her head was about six inches from Plaintiff's bleeding vulva. Plaintiff did not feel free to leave.

116.    After satisfying Defendant for the second time that Plaintiff was, in fact, menstruating, Defendant permitted Plaintiff to continue with her visit.

117.    Defendants did not possess reasonable suspicion for either search of Plaintiff's unclothed genitals.

*Second Visit: April 2014*

118.    Plaintiff again traveled to SCCF on or about April 12, 2014 to visit the same inmate. Plaintiff brought her three children with her to the visit. CCA employees told Plaintiff that her children had to be with her at all times.

119.    CCA's visitation policy at SCCF stated, in part, "Visitors are responsible for controlling their children." The same visitation policy also stated, in part, "All visitors under eighteen (18) years of age must be accompanied by an approved visitor who is either the child's parent or legal guardian."

120.    Plaintiff was menstruating at the time of her April visit as well.

121.    Plaintiff placed her personal belongings, including two sealed and wrapped sanitary napkins, on the security checkpoint counter.

122.    Defendant Garska, who was working the security checkpoint, asked Plaintiff is she was on her period. Plaintiff responded that yes, she was on her period. On information and belief, Defendant Garska then called Defendant Gonzales to the checkpoint.

123. Defendant Gonzales told Defendant Garska they had to go to the restroom for a search since Plaintiff was menstruating.

124. Defendant Jones ordered Plaintiff Jane Doe #3 and Plaintiffs Minor Does #1-3 into the restroom for a pat-down frisk search of their bodies. Defendant Jones did not discover contraband on any of the four visitors during the pat-down search.

125. Neither Plaintiff, nor Plaintiff Minor Does #1-3, felt free to leave.

126. In the presence of Minor Does #1-3, Defendant Jones told Jane Doe #3 she must change her sanitary napkin. Defendant said words to the effect of, "I have to see the dirty pad."

127. After Plaintiff showed Defendant her sanitary napkin containing menstrual blood, Defendant Jones ordered Plaintiff to spread her legs and squat in front of her children.

128. Defendant Jones positioned her body so that her head was under Plaintiff Doe #3's pelvic area, between her legs. Defendant Jones leaned her head to the side so she could get a close vantage point of Plaintiff's bleeding genitalia. Defendant Jones's head was only a few inches from Plaintiff's genitals.

129. Jane Doe #3's teenage daughter, Minor Doe #1, asked Defendant Jones whether she was supposed to inspect Plaintiff's genitals. Defendant replied with words to the effect of, "Yes, it is policy."

130. Plaintiff threw her soiled sanitary napkin in the trash, and Defendant rifled through the trash to ensure that Plaintiff threw the bloody pad away.

131. After Defendant was satisfied that Plaintiff was, in fact, menstruating, she permitted Plaintiff to proceed with her visit.

132.    When Plaintiff exited the restroom, she noticed that Defendant Garska was at the visitation desk and did not attempt to stop the search.

133.    The body cavity search in front of her three children caused Plaintiff extreme emotional distress and caused her to feel humiliated, embarrassed, and dehumanized.

134.    After the search, Minor Doe #2 asked her mother words to the effect of, "What did they do, mommy? They looked under my mommy's legs!"

135.    Later, Plaintiff Doe #3 felt the need to urinate. However, although Plaintiff had already been strip-searched, Defendant Garska did not permit Plaintiff to use the restroom alone.

136.    Defendant Garska made Plaintiff squat in her presence so that her vaginal area could be inspected again.

137.    At Defendant Garska's orders, Plaintiff exposed her genitals, and Defendant Garska observed Plaintiff's unclothed pubic area. She discovered no contraband, and Plaintiff was allowed to continue her visit.

138.    At no time during or after Defendants' searches of Plaintiff's unclothed genitals in March and April 2014 did any CCA employee, agent, or contractor provide Plaintiff with a form memorializing the body cavity inspection.

139.    No reasonable suspicion supported Defendants' searches of Plaintiff. Plaintiff called SCCF leadership, including Defendants Chapman and Sullivan, on multiple occasions to complain about the search and Defendant Gonzales, but Plaintiff's concerns went unheeded.

## INJUNCTION ALLEGATIONS

140.     Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

141.     Plaintiffs Doe #1 and Doe #2 intend to visit SCCF in the future.

142.     A female menstruates, on average, from three to five days each menstrual cycle. Menstrual cycles last, on average, 28 days each.

143.     Therefore, it is highly likely that Plaintiffs will visit SCCF while menstruating in the future. Plaintiffs fear future, repeated violations of their constitutional rights should they choose to visit SCCF while menstruating.

144.     A woman such as Ms. Doe #1 and Doe #2 should not be forced to make the intolerable choice between abstaining from visiting an inmate in prison because she is on her period and visiting the prison with the risk of being subjected to another humiliating and degrading search of her exposed genitalia. The ongoing constitutional violation and strong likelihood of future constitutional violations constitutes irreparable injury.

145.     On information and belief, Plaintiffs will be harmed by the absence of a CCA policy specifically permitting feminine sanitary products.

146.     Ms. Doe #1-2 are entitled to preliminary and permanent injunctive relief from the strip- or body cavity search of menstruating women conducted as a matter of course at SCCF pursuant to CCA custom.

147.     An injunction requiring Defendants comply with minimal Fourth Amendment standards would not cause them excessive injury or any irreparable harm. The public interest favors the grant of injunctive relief against Defendants.

# CLAIMS FOR RELIEF

## *MONELL* LIABILITY AGAINST
## CORRECTIONS CORPORATION OF AMERICA,
## ARVIL "BUTCH" CHAPMAN, GINA GONZALES, AND DANIEL SULLIVAN
### (Counts I, II, III, IV, and V)

### A. Existence and Execution of a Practice and Custom

148. Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

149. On information and belief, Defendants Chapman, Sullivan, and CCA created, affirmatively issued, permitted, encouraged, tolerated, and knowingly acquiesced in violating Plaintiffs' rights, through the existence of an official pattern, practice, and custom of ignoring or otherwise disregarding Tennessee Department of Correction policy and well-established Fourth Amendment jurisprudence requiring visual cavity searches of visitors to be based on reasonable suspicion. Defendant Sullivan ratified the custom, and stated that at SCCF, searches of female visitors to check whether they were menstruating is "standard." CCA's custom enjoys the force of law at SCCF.

150. Moreover, on information and belief, Defendants CCA, Sullivan, and Chapman encouraged the violation of Plaintiffs' rights by adhering to a custom of noncompliance with Fourth and Fourteenth Amendment standards for the searches of female visitors.

151. Tennessee Department of Correction promulgates written policies governing searches. The Department of Correction issued a policy concerning strip-searches and body cavity searches of visitors in February 2014, prior to Defendants' search of Jane Doe #1-3.

152.    Tennessee Department of Correction policy in effect at all relevant times stated, in part:

> Searches of visitors, volunteers, employees, inmates, inmate housing units, and other areas of the facility shall be conducted in accordance with the procedures set forth below and in a manner which will avoid unnecessary force, embarrassment, or indignity to those whose person and/or belongings are being searched.

153.    Department of Correction policy prevented detaining a prison visitor to conduct a search unless "probable cause exists that the individual has illegal item(s) in their possession[.]"

154.    Department of Correction policy specifically contemplated strip- and visual body-cavity searches of visitors. The policy stated:

> Strip and visual body cavity searches of visitors require the prior approval of the Warden/designee based upon a finding of reasonable suspicion. The approved Authorization for Search, CR-2156, shall be completed by the staff member designated to conduct the search and returned to the Warden for filing. A copy will be provided for the person being searched.

155.    Moreover, Department of Correction policy specifically contemplated when a corrections officer may require a visitor to change a feminine hygiene product:

> a.   Visitors may be required to replace their feminine hygiene products in the presence of institutional staff only if there exists individualized reasonable suspicion to prove that contraband is being brought in.
>
> b.   Local policy may dictate non-contact visitation as an alternative option when a feminine hygiene product is detected. (See Policy #507.01.1)

156.    Defendants did not offer the Women Plaintiffs the "alternative option" of non-contact visitation and instead insisted on body cavity searches.

157.    CCA was deliberately indifferent to Plaintiffs' constitutional rights because through its policymakers, it was aware of the official policy against conducting

suspicionless strip searches and visual body cavity inspections of visitors, yet permitted such illegal searches anyway through official tolerance, acquiescence, and affirmative statements. For example, Defendant Sullivan's comments to Plaintiff Doe #1 demonstrate that CCA's illegal visitor search custom at SCCF was routine and standard, which is evidence of deliberate indifference to a persistent pattern of unlawful searches. Defendants Sullivan and Chapman were aware or should have been aware of the high risk that non-adherence to the constitutional standards for strip- visual-cavity searches of visitors would result in a widespread and systematic pattern of illegal searches and detentions of female visitors, as well as violations of their Equal Protection and Due Process rights. CCA's unwritten custom of ignoring the Fourth Amendment and written policy resulted in damages to Plaintiff as alleged.

158.    Accordingly, CCA had and continues to have a pattern and custom of disregarding Department of Correction policy and constitutional law, and insisting that the genitals of menstruating females be routinely searched to verify their menstruation, without reasonable suspicion. CCA's pattern and custom caused Plaintiffs to be searched and detained without the required justification under the Constitution. Defendants' pattern and custom is therefore the moving force behind the constitutional violations against Ms. Doe #1-3.

159.    On information and belief, Defendants Chapman and Sullivan ordered and commanded that all female visitors suspected of being on their menstrual cycles be strip-searched absent reasonable suspicion.

160.    Defendant Chapman's failure to require adherence to state law concerning visitor searches evinces his involvement in the events leading to the Plaintiffs' injuries. On

information and belief, Defendant Chapman was aware of body-cavity or strip-searches of female visitors and yet noticed that he was not requested to authorize each individual search. He therefore actively ordered, perpetuated, and supported the custom of noncompliance with state law and in fact knowingly acquiesced in the continuing violation of visitors' rights. Defendant Chapman knew of the violation of women's rights and had the ability to stop the illegal behavior, yet he did nothing.

161. Defendants CCA, Sullivan, Gonzales, and Chapman authorized, approved, condoned, and knowingly acquiesced in the unconstitutional conduct.

162. On information and belief, after being made aware of the violations yet refusing to take any action and by not requiring the paperwork mandated by state law, Defendants CCA, Sullivan, and Chapman were deliberately indifferent to Plaintiffs' rights and acquiesced in the illegal conduct.

## B. **Failure to Train**

163. Defendants Sullivan, Gonzales, Chapman, and CCA, as the persons responsible for security at SCCF, made conscious choices not to conduct sufficient training on the official Department of Corrections policy and on the Fourth and Fourteenth Amendments, as they apply to searches of visitors. Defendant Gonzales, as head of visitation at SCCF, failed to train the CCA employees, agents, and officers she supervises on the correct method and justification for conducting strip searches, including training on the applicable legal standards and state policy. Their failure to conduct training on visitor strip- and body-cavity searches was systematic and pervasive, as on information and belief, correctional officers were not trained at all on the February 2014 Department of Corrections policy, or received very minimal training in such a haphazard way that was so

25

plainly insufficient and reckless, or grossly negligent, that it was a certainty that visitors would be strip-searched and be required to expose their genitals in violation of the U.S. Constitution.

164.    On information and belief, Defendants Sullivan, Gonzales, Chapman, and CCA failed to conduct training sessions, classes, seminars, courses, hypotheticals, and testing so as to prevent violations of the Constitution.

165.    On information and belief, Defendants Sullivan, Chapman, and CCA failed to inform correctional officers of the DOC policy and failed to conduct routine continuing education on the constitutional rights of visitors.

166.    On information and belief, Defendant Chapman, who on information and belief ordered the unconstitutional conduct to occur, was aware that he was not asked to approve requests for strip-searches of visitors, and he deliberately ignored that he was not asked to approve such requests, which must be supported by reasonable suspicion. Defendant Chapman flouted his responsibility to approve such requests, and it was reasonably certain that violations of Plaintiffs' rights would occur as a result. He therefore condoned, encouraged, and approved of the illegal conduct by not requiring the completion of the required form and knowingly acquiesced in failing to remediate his employees' unconstitutional conduct through a minimally adequate training program.

167.    Defendants Gonzales, Sullivan, Chapman, and CCA were deliberately indifferent to Plaintiff's constitutional rights by choosing to conduct insufficient training on visitor searches, when sufficient training would have prevented the violation of Plaintiff's rights.

168.    Even though Defendants Gonzales, Sullivan, Chapman, and CCA were aware or should have been aware of the state policy and of the substantially certain risk of a pattern of constitutional violations for non-adherence to the policy, they promulgated and supported a custom of noncompliance with the state policy and failed to train on the correct policy. On information and belief, Defendants Sullivan, Gonzales, CCA, and Chapman's conscious choice and conduct in selecting and carrying out a training regime was reckless or grossly negligent to the point that future misconduct by correctional officers was almost inevitable or would certainly occur.

169.    Defendant Sullivan stated that searches of female visitors to verify their menstrual status were "standard." Therefore, Defendant Sullivan and his supervisor Defendant Chapman, as well as CCA, were on notice of a pattern of conduct that violated the Constitution. Defendants CCA's, Sullivan's, and Chapman's inadequate training program for officers was responsible for searching visitors absent constitutional safeguards and caused the type of injury Plaintiffs suffered. Consequently, Defendants did not adhere to Department of Correction policy, and adherence to state policy would have prevented Defendants Gonzales, Garska, Qualls, Jones, Roberts Cornwall, and Roach from performing the unconstitutional search of Plaintiffs. Defendants Sullivan and Chapman's choice not to conduct sufficient training of correctional officers caused correctional officers to search Plaintiffs without reasonable suspicion and to violate their rights under the Fourth and Fourteenth Amendments. On information and belief, Defendants' training program was inadequate for corrections officers tasked with screening visitors, and Defendants Gonzales, Sullivan, Chapman, and CCA chose from available alternatives to conduct little,

ineffective, or no training on the constitutional rights of visitors and when it is appropriate to subject them to strip searches, which directly caused Plaintiffs' injuries.

## C. <u>Failure to Supervise</u>

170.    Defendants Gonzales, Sullivan, Chapman, and CCA systematically failed to supervise correctional officers and CCA agents, employees, and those under their control tasked with conducting searches, as appropriate, of female visitors. On information and belief, they failed to take actions that would have prevented unconstitutional searches of Plaintiffs, such as by ensuring that highly invasive searches such as visual body cavity searches were approved, on a case-by-case basis, by supervisors. Their failure to supervise and monitor their employees, agents, and those under their control was so pervasive and complete as to constitute deliberate indifference, because it was near-certain that failing to supervise correctional officers performing high-risk duties such as strip- and body-cavity searches would result in constitutional violations. Defendants' failure to supervise correctional officers was not an isolated incident. Rather, Defendants Gonzales, Sullivan, Chapman, and CCA acted pursuant to the entrenched custom of verifying the menstruation of women claiming to be on their menstrual cycles and therefore did not check correctional officers' compliance with the constitutionally minimal requirement that strip searches be conducted according to applicable constitutional standards, such as reasonable suspicion, and to ensure that CCA's customs and practices do not violate the constitutional rights of visitors. The risk of not adequately supervising front-line correctional officers to ensure that constitutional violations did not occur was obvious. Therefore, Defendants Gonzales, Sullivan, Chapman, and CCA ignored a pattern of abuses and knowingly chose not to

adequately train correctional officers and chose not to ensure their compliance with the law and with written Tennessee state policy through wholly inadequate supervision.

171.    State policy requires that the warden or his or her designee expressly authorize strip searches and body cavity searches of visitors, based on an individualized finding of reasonable suspicion.

172.    On information and belief, neither Defendants Sullivan nor Chapman, nor any other person with authority delegated by Defendant Chapman, found reasonable suspicion to be present for Jane Doe 1-3.

173.    On information and belief, neither Defendant Sullivan nor Defendant Chapman—nor any other person designated by Defendant Chapman—provided written approval for the search of Plaintiffs.

174.    Defendants CCA, Sullivan, Gonzales, and Chapman deliberately turned a blind eye to ongoing constitutional violations by not adhering to state policy and by not requiring approval for strip- or body cavity searches.

175.    Correctional officers' performance of strip- and body cavity searches occurred with constitutionally inadequate supervision.

176.    Defendants Sullivan, Chapman, and Gonzales chose a supervision program of not insisting that they authorize strip- and body cavity searches from among several alternatives—including the alternative endorsed by state policy requiring warden or designee approval. On information and belief, they failed to question officers on the frequency of strip- and body cavity searches and the justifications for strip- and body cavity searches.

177.    The consequences of Defendants' failure to supervise were plainly obvious and known to Defendants, and Defendants' deliberate conduct, which involved not even the most minimal supervision, allowed pervasive violations of the law.

178.    The existence of Defendants' official practice, pattern, and custom was the moving force of Defendants' violation of Plaintiffs' constitutional rights.

### *MONELL* LIABILITY AGAINST
### TRINITY SERVICES GROUP, INC.
### (Counts I, II, III, IV, and V)

**A.  Failure to Train**

179.    Defendant Trinity Services Group, Inc., utterly and completely failed to train employees, agents, contractors, or others under its control, such as Defendant Roberts Cornwall, of the limits or outer boundaries of their authority or duties. Because Defendant failed to adequately train those under its control of the obvious and foreseeable result of those under its control interacting with civilian visitors to SCCF, it was a near certainty that violations of constitutional rights would occur.

180.    It is highly likely that persons under the control of Defendant Trinity Services Group, Inc., who have not been adequately trained on the proper scope of their duties in a prison, would agree to assist CCA or other employees in the performance of correctional duties aside from the normal duties ordinarily performed by Trinity Services Group employees, agents, and contractors, such as food service. Those under the control of Trinity Services Group, as they were inadequately trained on the constitutional contours of corrections officer duties, were wholly inept to perform searches of visitors to a prison such as SCCF. The unlawful search, seizure, and discrimination of Plaintiff Jane Doe #2 is

the natural consequence of a systemically inadequate training program as to Trinity Services employees, agents, and contractors' scope of authority.

181.    It was therefore a near certainty that Trinity Services Group employees, agents, or contractors would violate the Constitution when they conducted searches of visitors.

182.    Defendant Trinity Services Group was deliberately indifferent to Plaintiff Doe #2's constitutional rights by choosing to conduct insufficient training on when to assist CCA employees, officers, or agents, including in the conduct of searches, as sufficient training would have prevented the violation of Plaintiff's rights.

183.    Defendant Trinity Services Group maintained a pervasive custom of permitting its employees, agents, contractors, and others under its control to perform work for CCA such that without adequate training, it was substantially certain that violations of the Constitution by its employees, agents, contractors and others under its control would occur.

**B.  <u>Failure to Supervise</u>**

184.    Defendant Trinity Services Group systematically refused and failed to supervise its employees, agents, contractors, and others under its control to ensure that they did not perform work outside the scope of their usual, limited contracted duties on behalf of CCA and SCCF.

185.    Defendant Trinity Services Group failed to discipline or remediate the behavior of employees, agents, contractors, or those under its control who performed duties at SCCF involving contact with visitors. Accordingly, it was a near certainty that without adequate supervision in a prison environment, employees, agents, contractors, and others

under Defendant's control would conduct searches governed by the Constitution in a way that would violate the rights of visitors such as Jane Doe #2.

186. Defendant's failure to supervise and monitor its employees was so pervasive and complete as to constitute deliberate indifference, because it was near-certain that failing to supervise employees having contact with visitors—especially when such employees or agents should not have had such contact with visitors—would result in constitutional violations.

187. On information and belief, no Trinity Services Group supervisor or manager supervised Defendant Roberts Cornwall's participation in the unconstitutional search and seizure of Plaintiff Doe #2 or during Defendant Roberts Cornwall's work with Defendant Gonzales as described herein.

188. The risk of not adequately supervising employees, agents, and contractors having contact with visitors or CCA correctional officers to ensure that constitutional violations did not occur was obvious, but yet, Defendant ignored those risks and did not supervise Defendant Roberts Cornwall.

189. The consequences of Defendant's failure to supervise were plainly obvious and known to Defendant, and Defendant's deliberate conduct, which involved not even the most minimal supervision, allowed pervasive violations of the law, including illegal searches and seizures and the performance of visitor strip-searches outside of DOC policy.

190. The existence of Defendant's official practice, pattern, and custom was the moving force of Defendant's violation of Plaintiff's constitutional rights.

## COUNT I
### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
### UNCONSTITUTIONAL SEARCH
### (42 U.S.C. § 1983)
### (Women Plaintiffs against All Defendants)

191.    Women Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

192.    Defendants violated the Fourth Amendment's prohibition on unreasonable searches by conducting a body cavity or strip-search of Women Plaintiffs without reasonable suspicion and/or by failing to intervene to halt and prevent unconstitutional conduct when they could have done so. Rather, Defendants Qualls, Garska, Trinity Services Group, Inc., and Roberts Cornwall supported and actively assisted in the searches and protected the scene of the unconstitutional searches, exposing Women Plaintiffs to a humiliating and degrading violations of their constitutional rights.

193.    Defendants violated the Fourth Amendment's prohibition against unreasonable searches by conducting a body cavity or strip-search of Plaintiff without reasonable suspicion.

194.    Defendants Chapman, Sullivan, Gonzales, and CCA violated the Women Plaintiff's constitutional rights by enforcing a custom of ignoring state policy concerning visitor strip-searches, by failing to adequately train employees on the policy, and by failing to adequately supervise CCA employees.

195.    Trinity Services Group, Inc., violated Plaintiff Jane Doe #2's right to be free of unreasonable searches through complete failure to train and supervise.

196.    All Defendants, and through CCA, Chapman, Sullivan, and Gonzales's policy and custom, conducted unreasonable searches of the Women Plaintiffs by

performing the unlawful body cavity inspections or assisting others in performing and failing to intervene to prevent or halt unlawful body cavity inspections of the Women Plaintiffs.

197.    Defendants, through their individual conduct and by implementation of this custom, policy, or practice, and by failing to train and supervise, violated Plaintiff's right to be free from unreasonable seizures.

198.    Women Plaintiffs suffered injuries, including, but not limited to, violations of their constitutional rights, loss of liberty, humiliation, shame, fear, and extreme emotional distress as a direct and proximate result of Defendants' illegal actions.

## COUNT II
### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### SUBSTANTIVE DUE PROCESS
### (42 U.S.C. § 1983)
### (Women Plaintiffs against All Defendants)

199.    Women Plaintiff re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

200.    Women Plaintiffs enjoy the fundamental right to personal security, privacy, and bodily integrity.

201.    Defendants violated Women Plaintiffs' Fourteenth Amendment substantive due process rights to personal security and bodily integrity when they arbitrarily conducted searches of Women Plaintiffs' genitalia to verify their menstruation, or when they failed to intervene to halt or prevent the violation of Plaintiffs' rights to personal security and bodily integrity.

202.    Defendants Gonzales, Sullivan, Chapman, and CCA violated Plaintiff's substantive due process rights through their custom of conducting suspicionless searches

of the genitals of menstruating women, their failure to conduct adequate training on visitor searches and the applicable standards governing such searches, and their failure to supervise corrections officers' conduct. Defendant Chapman failed to ensure that he or his designee approved strip-searches of visitors.

203.    Defendants' non-adherence to state policy also violated the process that was due to Women Plaintiffs, because Defendants maintained a custom of disregarding the policy and conducting strip- and body cavity searches when women were suspected of menstruating.

204.    Therefore, Defendants exercised their power to conduct strip-searches without any reasonable justification and in an arbitrary and capricious manner. Defendants' insistence that menstruating women suffer a search of their genitals to verify their menstruation—not just an "ordinary" search but one that implicates women's most private affairs and may implicate reproductive considerations—was in callous disregard of Women Plaintiffs' constitutional rights. Furthermore, Defendants' promulgation of and reliance on their custom was arbitrary and unfair, and consequently violated the Due Process Clause.

205.    Defendants' conduct was deliberately indifferent to Women Plaintiffs' Fourteenth Amendment rights because Defendants devised or chose to implement CCA's custom in a way that shocks the conscience and from among alternative courses of action.

206.    Defendant Trinity Services Group violated Plaintiff Doe #2's constitutional rights through its complete failure to train and supervise its employees, contractors, agents, and those under its control.

207.     Defendants, through their individual conduct and by implementation of this custom, policy, or practice, and by failing to train and supervise, violated Plaintiff's right to be free from unreasonable seizures.

208.     Women Plaintiffs suffered injuries, including, but not limited to, violations of their constitutional rights, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate result of Defendants' illegal actions.

**COUNT III**
**VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**EQUAL PROTECTION OF THE LAW**
**(42 U.S.C. § 1983)**
**(Women Plaintiffs against All Defendants)**

209.     Women Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

210.     Plaintiffs are all women.

211.     Gender is a quasi-suspect class.

212.     CCA's policy at SCCF distinguishes between men and women in several ways. For example, both men and women have the biological capacity to smuggle contraband into SCCF through body orifices.

213.     Defendants' custom, practice, and behavior of classifying women into a category singled out for additional, humiliating genital searches is not substantially related to an important government interest.

214.     Women and men bear the burdens of CCA's custom unequally. Defendants have discriminated against Women Plaintiffs based on their gender.

215. Pursuant to CCA's custom of requiring menstruating female visitors to demonstrate their menstruation to CCA employees, Defendants treated Women Plaintiffs unequally without an important government interest in doing so.

216. Male visitors are not required to show their genitalia absent reasonable suspicion.

217. Plaintiff Doe #1 volunteered to replace her feminine sanitary napkin. The replacement of Plaintiff's hygiene pad should have obviated the need for inspection of her exposed genitalia absent reasonable suspicion of criminal activity.

218. Defendants did not provide Plaintiffs Doe #1-3 the alternative to forego contact visitation at the times of their trips, which would have obviated the need for inspection of their exposed genitalia absent reasonable suspicion of criminal activity.

219. No important government interest existed for Women Plaintiffs to demonstrate to Defendants that they were, in fact, menstruating after being given a replacement, institutional hygiene pad, and Defendants failed to implement their custom in a way that was substantially related to the government's interest.

220. Defendants Qualls and Garska violated the Fourteenth Amendment by positioning themselves outside the bathroom door "guarding" where Ms. Doe #1 and #3, respectively, were being searched, with knowledge that Defendants Garska, Jones, and Roach were searching Plaintiff Doe #1 and #3's genitalia through the application of a custom that violates equal protection of the laws and unlawfully singles out women, and by failing to intervene to halt and prevent unconstitutional conduct. Rather, they supported and actively assisted in protecting the scene of the unconstitutional search and unconstitutional discrimination, exposing Women Plaintiffs to humiliating and degrading

violations of their constitutional rights. Defendant Qualls stood in the bathroom, ostensibly as a female "witness" for Defendant Garska. Defendant Qualls failed to intervene to prevent or halt the discriminatory conduct, and in fact, allowed it to proceed. Defendant Roberts Cornwall conducted a pat-down search of Plaintiff Doe #2 in anticipation of the body cavity search and facilitated and allowed that unlawful search to proceed through assisting Defendant Gonzales. CCA and Trinity Services Group, Inc., are liable for their failure to train and supervise its employees, agents, contractors, and those under its control, and CCA is additionally liable for its illegal policy or custom.

221.    Defendants, through their individual conduct and by implementation of this custom, policy, or practice, and by failing to train and supervise, violated Plaintiff's right to be free from unreasonable seizures.

222.    Women Plaintiffs suffered injuries, including, but not limited to, discrimination, violations of their constitutional rights, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate result of Defendants' illegal actions.

### COUNT IV
### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS
### TO THE UNITED STATES CONSTITUTION
### UNCONSTITUTIONAL SEIZURE
### (42 U.S.C. § 1983)
### (All Plaintiffs against All Defendants)

223.    All Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

224.    The Fourth Amendment to the United States Constitution guards against unreasonable seizures.

225.    Defendants Garska, Jones, Roberts Cornwall, Qualls, Gonzales, Roach, CCA, and Trinity Services Group restricted Plaintiffs' freedom of movement by isolating

them from the SCCF checkpoint and requiring them to enter the CCA restroom to be searched.

226.    Defendants Garska, Gonzales, and Jones restricted the Child Plaintiffs' freedom of movement by isolating them from the SCCF checkpoint and requiring them to witness the search of their mother.

227.    Defendant Garska seized Plaintiff Doe #3 by telling her she must enter the restroom to replace her sanitary product in view of a CCA employee.

228.    Defendant Garska seized Plaintiff Doe #1 by ordering Plaintiff to sit in a certain location, and by Defendant Garska telling Plaintiff Doe #1 words to the effect of, "We'll have to see," and then isolating her from the rest of the visitation area in a vacant bathroom, effectively confining her.

229.    Based on the totality of the circumstances surrounding Defendants' detention of Plaintiffs, a reasonable person in each Plaintiff's position would not have felt free to leave. In fact, Plaintiffs did not feel free to leave.

230.    Plaintiffs did not consent to the detention. CCA's visitation policy prevented Plaintiffs from having the option to consent to the detention. Faced with the possibility of permanent suspension of visitation, they could not freely, knowingly, or intelligently consent to a detention for the purpose of yielding to a strip-search or body cavity search.

231.    Defendant Garska seized Plaintiff Doe #1 when she physically isolated her from the checkpoint, performed a patdown, and then commanded Plaintiff to sit in a specific place.

232.    Defendant Roberts Cornwall seized Plaintiff Doe #2 by conducting a patdown search of her body in anticipation of the cavity inspection. Defendant Gonzales seized Plaintiff Doe #2 by isolating her from the visitation area in the restroom and ordering that she undergo a visual cavity search, and then by insisting on and conducting the search.

233.    Defendants Roach and Garska seized Plaintiff Doe #3 by instructing her to step into the restroom for an invasive search and then by conducting the search. Defendant Garska seized Plaintiff Doe #3 by instructing Plaintiff she had to enter the restroom to replace her tampon in the presence of a CCA employee, who turned out to be Defendant Roach.

234.    Defendant Gonzales seized Plaintiff Doe #3 and the Child Plaintiffs by ordering them into the restroom to undergo the search. Defendant Roberts Cornwall seized Plaintiff Doe #3 and the Child Plaintiffs by requiring the children be present in the restroom for the search.

235.    Defendants lacked reasonable suspicion to detain Plaintiffs.

236.    Defendants Jones, Roberts Cornwall, Roach, Garska, Gonzales, CCA, Trinity Services Group, and Qualls detained Plaintiffs, or acquiesced in the detention of Plaintiffs by failing to halt or prevent the detentions, by facilitating and/or conducting the detentions necessary for Defendants Garska, Roach, Gonzales, and Jones to observe Women Plaintiffs' unclothed pubic area.

237.    Defendants, through their individual conduct and by implementation of this custom, policy, or practice, and by failing to train and supervise, violated Plaintiff's right to be free from unreasonable seizures.

238.     Plaintiffs suffered injuries, including, but not limited to, violations of their constitutional rights, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate result of Defendants' illegal actions.

## COUNT V
### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### PROCEDURAL DUE PROCESS
### (Women Plaintiffs against All Defendants)

239.     Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

240.     Plaintiffs had and have a fundamental liberty interest in bodily integrity, personal autonomy, equal protection of the law, and to be free from unreasonable searches and seizures.

241.     Furthermore, State of Tennessee procedures provided Women Plaintiffs with a liberty interest in avoiding capricious searches of their genitalia.

242.     The State of Tennessee's policies use mandatory language which dictates a particular outcome. Plaintiffs relied on this regulatory scheme to protect their privacy rights.

243.     Tennessee's procedures were designed to protect the bodily integrity and personal dignitary rights of visitors.

244.     Defendants violated Plaintiffs' procedural due process rights by failing to afford the process that was due to them, as Defendant Chapman or his designee did not approve the strip-search of Women Plaintiffs before the searches occurred, the required paperwork was not generated, and Defendants failed to provide Plaintiffs with a copy of required paperwork, and/or by failing to intervene to prevent violation of Plaintiffs' due

process rights by requiring Defendants Gonzales, Garska, Qualls, Roach, Jones, and Roberts Cornwall to adhere to the process due to Plaintiff.

245.    There existed no adequate pre-deprivation remedy for Plaintiffs to vindicate the imminent violation of their rights.

246.    Defendants authorized and ratified the unconstitutional conduct, and Defendant Sullivan told Plaintiff Doe #1 that suspicionless searches of women's genitals to verify that they were menstruating was standard at SCCF. On information and belief, Defendant Chapman failed to supervise and train his officers and abused his authority to approve strip-searches of visitors by granting broad, uncircumscribed powers to his subordinates, allowing for widespread constitutional violations.

247.    Defendant CCA is liable for its custom, policy, failure to train, and failure to supervise. Defendant Trinity Services Group is liable for its failure to train and supervise those under its control.

248.    Plaintiffs suffered damages as a direct and proximate result of Defendants' unlawful conduct, including, but not limited to, violations of her constitutional rights, loss of liberty, humiliation, shame, fear, and emotional distress.

## COUNT VI
### INTENTIONAL OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (All Plaintiffs against All Defendants)

249.    Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

250.    Defendants, in operating a prison and allowing visitors such as Plaintiff, owed Plaintiffs a duty of reasonable care to protect their visitors from harm.

251.    Defendants' conduct in requiring Women Plaintiffs to undergo inspections of their menstruating genitalia and Child Plaintiffs to watch had no legitimate law enforcement purpose and constituted outrageous conduct, which should not be tolerated in civilized society.

252.    Requiring the Child Plaintiffs to watch an invasive search of their mother caused them serious mental and emotional injury.

253.    By detaining all Plaintiffs and searching Women Plaintiffs in a degrading and humiliating manner, it was reasonably foreseeable that Plaintiffs would suffer severe or serious mental and emotional injury. Defendants' custom made the harm Plaintiffs suffered a near certainty.

254.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered and continue to suffer from severe or serious mental and emotional injury.

255.    Defendants' conduct was intentional, reckless, or negligent.

256.    Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

257.    Defendant Trinity Services Group, Inc., is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity with its own customs, policies, and practices, as well as the customs, policies, and practices of CCA, and pursuant to the doctrines of agency, apparent

43

agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of Defendant's duty to ensure the health and safety of visitors of the SCCF.

## COUNT VII
### NEGLIGENCE
### (All Plaintiffs against All Defendants)

258.     Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

259.     Defendants, in operating a prison and allowing visitors such as Plaintiffs, owed Plaintiffs a duty of reasonable care to protect their visitors from harm.

260.     Defendants Sullivan, Chapman, Gonzales, and CCA, by ratifying and promulgating a custom of non-adherence to state strip-search policy and ignoring the substantive requirements of the state policy, which protects the rights of visitors, and by failing to supervise and train correctional officers, breached their duty of reasonable care.

261.     On information and belief, Defendants Garska, Qualls, Gonzales, Roach, Roberts Cornwall, and Jones, by detaining and suffering Plaintiffs to undergo invasive, humiliating searches, breached their duty of due care to Plaintiffs.

262.     By failing to provide adequate training, by failing to adequately oversee the work of their employees, and by failing to require adherence to DOC policy and the U.S. Constitution after being put on notice of continuing violations thereof, Defendants Sullivan and Chapman had knowledge of their employees' unfitness for work involving searches of visitors.

263.     Defendants Sullivan and Chapman breached their duty of care by failing to adequately supervise and train Defendants Garska, Gonzales, Qualls, Jones, Roach,

Roberts Cornwall, and others involved in the illegal searches and seizures of Plaintiffs and in discriminating against women.

264. It was foreseeable that the supervisors' and correctional officers' conduct would lead to Plaintiffs suffering harm, including loss of dignity, humiliation, shame, emotional distress, and fear.

265. Defendants' conduct was the direct and proximate cause of Plaintiffs' injuries.

266. Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

267. Defendant Trinity Services Group, Inc., is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity with its own customs, policies, and practices, as well as  the customs, policies, and practices of CCA, and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of Defendant's duty to ensure the health and safety of visitors of the SCCF.

## COUNT VIII
### ASSAULT
**(Plaintiffs Jane Doe #1 and #3 against Defendants Garska, Roach, Jones, and CCA)**

268. Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

269.    Defendants acted devoid of any legitimate law enforcement purpose, as the suspicionless and arbitrary search of all menstruating visitors is not contemplated by our laws or the Constitution.

270.    Defendants Garska, Roach, and Jones, by peering onto Plaintiff Doe #1 and Doe #3's unclothed pubic area and moving closer to determine if Plaintiffs were, in fact, menstruating, frightened Plaintiffs and placed them in apprehension of harm or offensive contact.

271.    Defendant CCA conformed to a custom of permitting its female visitors to be in fear of imminent harm or fear by subjecting them to suspicionless cavity inspections.

272.    It was foreseeable that Defendants' conduct toward Plaintiffs #1 and #3 would place them in imminent fear.

273.    Defendants' conduct was intentional.

274.    Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

275.    Plaintiffs suffered injuries, including, but not limited to, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate cause of Defendants' illegal actions.

## COUNT IX
### INVASION OF PRIVACY
### (Women Plaintiffs against All Defendants)

276.    Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

277.    A woman's unclothed pubic area is one of her most intimate and private places, affairs or concerns.

278.    Defendants searched Women Plaintiffs' genitals to verify that they were menstruating, or facilitated or arranged for the search of Plaintiffs. Defendants' conduct occurred without any suspicion or legitimate law enforcement purpose.

279.    Defendants physically or otherwise invaded the seclusion and privacy of Women Plaintiffs' bodies.

280.    Defendant Chapman, as warden, and on behalf of CCA, cooperated with Defendants Sullivan and Gonzales to ensure that all women suspected of menstruating should be searched.

281.    All Defendants acted intentionally, with the desire that they invade Plaintiffs' privacy. Defendants' conduct is highly offensive to a reasonable person. A reasonable woman in Plaintiffs' positions would strongly object to Defendants' conduct.

282.    Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

283. Defendant Trinity Services Group, Inc., is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity with its own customs, policies, and practices, as well as the customs, policies, and practices of CCA, and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of Defendant's duty to ensure the health and safety of visitors of the SCCF.

284. Plaintiffs suffered injuries, including, but not limited to, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate result of Defendants' illegal actions.

## COUNT X
### FALSE IMPRISONMENT
**(All Plaintiffs against All Defendants)**

285. Plaintiffs re-allege and re-aver the preceding paragraphs, and the preceding are incorporated herein by reference.

286. Defendants intentionally restrained or detained the Women and Child Plaintiffs, against their will, in order to effectuate a search of the Women Plaintiffs' pubic areas.

287. Defendants lacked any lawful reason for detaining Plaintiffs.

288. Defendants Sullivan, Chapman, Gonzales, and CCA cooperated to falsely imprison Plaintiffs, as they formulated and enacted a custom of searching the pubic areas of all female visitors suspected of being on their menstrual cycles. Defendant Gonzales, as head of visitation, failed to train and supervise CCA employees working under her control to ensure compliance with the law, and therefore cooperated with the other Defendants to violate Plaintiffs' rights to be free from false imprisonment.

289.     Plaintiffs were detained against their will so that Women Plaintiffs could be searched, without reasonable suspicion or other legitimate law enforcement purpose.

290.     Defendant CCA is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity to the customs, policies, and practices of CCA and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of CCA's non-delegable duty to ensure the health and safety of visitors of the SCCF.

291.     Defendant Trinity Services Group, Inc., is liable for its own conduct and the acts and omissions of its servants, employees, agents, and contractors by virtue of the fact that they acted in conformity with its own customs, policies, and practices, as well as the customs, policies, and practices of CCA, and pursuant to the doctrines of agency, apparent agency, implied agency, *respondeat superior*, vicarious liability, contract, and as a result of Defendant's duty to ensure the health and safety of visitors of the SCCF.

292.     Plaintiffs suffered injuries, including, but not limited to, loss of liberty, humiliation, shame, fear, and emotional distress as a direct and proximate cause of Defendants' illegal actions.

## <u>REQUESTS FOR RELIEF</u>

WHEREFORE, Plaintiffs request judgment for Plaintiff and against all Defendants as so follows:

(1)     Women Plaintiffs Doe #2-3 and Child Plaintiffs request that the Court grant their motion for protective order and permit them to continue in this action pseudonymously;

(2)     Plaintiffs request that they be awarded all damages to which it may appear they are entitled by the proof submitted in this cause, including compensatory damages and emotional distress damages;

(3)     Plaintiffs request that they be awarded punitive damages against all Defendants because they acted with evil motive or intent or with callous indifference to Plaintiffs' federally protected rights;

(4)     Plaintiffs request the Court enter declaratory judgment holding that Defendants' conduct, practice, and custom is in violation of Plaintiffs' federally protected rights;

(5)     Plaintiffs request an injunction requiring Defendants to conduct strip searches and body cavity searches of visitors in compliance with the law;

(6)     Plaintiffs request a trial by jury in all claims so triable;

(7)     Plaintiffs request that they be awarded reasonable expenses in this litigation, including reasonable attorney and expert fees and costs, pursuant to 42 U.S.C. § 1988; and

(8)     Plaintiffs request that they receive all further and general relief to which it may appear she is entitled, the interests of justice demanding it.

Dated: April 3, 2015

Respectfully submitted,

s/Tricia Herzfeld
Tricia Herzfeld (BPR No. 26014)
Elliott Ozment (BPR No. 4331)
William P. York II (BPR No. 30546)
OZMENT LAW
1214 Murfreesboro Pike
Nashville, TN 37217
(615) 321-8888 (office)
(615) 321-5230 (fax)
tricia@ozmentlaw.com
elliott@ozmentlaw.com
will@ozmentlaw.com

*Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Tricia R. Herzfeld, one of Plaintiff's attorneys, certify that I caused a copy of the foregoing document to be served by operation of the Court's Case Management/Electronic Case Files (CM/ECF) system upon the following attorneys of record on April 3, 2015:

James I. Pentecost
Jon A. York
Pentecost & Glenn, PLLC
106 Stonebridge Blvd
Jackson, TN 38305

Respectfully submitted,


<u>s/Tricia Herzfeld</u>
Tricia Herzfeld (BPR No. 26014)
OZMENT LAW
1214 Murfreesboro Pike
Nashville, TN 37217

*Attorneys for Plaintiff*