# Exhibit A

*Defendants' Expert Disclosures*

094-174-00

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JANE DOE, et al.,** | ) | |
| | ) | |
| **vs.** | ) | **No.: 3:15-0068** |
| | ) | |
| **CORRECTIONS CORPORATION OF** | ) | |
| **AMERICA, et al.,** | ) | |

_____

### DEFENDANTS' RULE 26(a)(2) EXPERT DISCLOSURE
_____

Defendants, Corrections Corporation of America ["CCA"], Arvil Chapman, Daniel Sullivan, Kelly Garska, Mia Qualls, Gina Gonzales, Felicia Roach and Mercedes Jones (hereinafter referred to collectively as "these Defendants"), by and through counsel, pursuant to Rule 26 of the Federal Rules of Civil Procedure, present this expert disclosure statement prepared by Charles Fisher.

### A.  IDENTIFICATION AND QUALIFICATIONS OF WITNESS

This is the report of Charles Fisher.  I have been retained by the Defendant to offer opinions in the case of **Jane Doe, et al. v. Corrections Corporation of America, et al**.  My curriculum vita is attached hereto.  I have authored six articles, all for publication in the journal *Corrections Professional* in 2001.  I developed the standards used by the state of Tennessee to inspect all local adult and juvenile detention facilities.  I managed the state detention facility inspection and detention officer training programs for the state of Tennessee from 1982 to 1998.  I have been appointed as an expert by Federal Courts in jail litigation cases as well as being appointed a Special Master by the Federal Courts in several cases.  I have served as an expert witness in a number of cases as listed in my curriculum vita.  My hourly rate is $150.  I have been paid a retainer of $4000 in this case.  I retain the right to alter my opinions should additional information become available.

1

## B. MATERIAL REVIEWED OR DATA CONSIDERED BY THE WITNESS IN THE FORMATION OF OPINIONS

1. The Third Amended Complaint

2. CCA Defendants' Answer to the Third Amended Complaint

3. CCA/SCCF/TDOC policies governing visitation and searches, including Policies 506.06, 507.01, 507.01.1, 9-120A, 9-20, 16-102A, 16-103A.

4. Log notes referencing the incident involving Jane Does #1 and #2.

5. The visitation provisions found in the SCCF Inmate Handbook.

6. The 2014 Visitation Handbook.

7. Visitation notes concerning Jane Does #1, #2, and #3.

8. The visitation histories of Jane Does #1, #2, and #3 to SCCF.

9. Photos of the visitation signs posted at SCCF.

10. 5-1A Incident Reports of incidents involving visitors caught smuggling at SCCF.

11. Deposition testimony of Jane Doe #1

12. Deposition testimony of Jane Doe #2

13. Deposition testimony of Debra Cornwall

14. Defendant CCA's Responses to Plaintiffs' Request for Admissions and Request for Production of Documents;

15. Defendants Garska's Jones', Qualls' Roach's, Chapman's, Gonzales' and Sullivan's responses to Plaintiff's Interrogatories and Requests for production propounded on each individual defendant.

16. Deposition testimony of Jane Doe #3;

17. Deposition testimony of Minor Doe #1;

18. Deposition testimony of Kelley Garska;

19. Deposition testimony of Gina Gonzales;

20. Deposition testimony of Mercedes Jones;

21. Deposition testimony of Mia Qualls;

2

22. Deposition testimony of Courtnee Lewis;

23. Deposition testimony of James Carruthers;

24. Deposition testimony of Felicia Roach;

25. Deposition testimony of Daniel Sullivan; and the

26. Deposition testimony of Arvil Chapman.

I relied on the documents, data and information referenced above as a basis for my opinions and my reasons therefore. I further rely on my experience as outlined in my curriculum vitae which is attached.

I further rely on my many years of experience as a detention facility inspector, corrections officer trainer, federal court special master, federal court monitor and in creating the standards used by the state of Tennessee for jail inspections and training of jail/prison employees. I have evaluated the policies and practices in local jails for over 30 years.

## C. STATEMENT OF OPINIONS

Corrections Corporation of America's (CCA) policies regarding visitor screening and searches are in line with industry standards. CCA uses policies promulgated by the Tennessee Department of Corrections (TDOC). Procedures in implementing those policies may vary by institution depending upon the mission and design of the institution. It is CCA's company policy that their operating procedures also meet the standards of the American Correctional Association (ACA), a national accrediting organization. Specific to this case, CCA, pursuant to the TDOC policy, only allows for strip searches of visitors under very restrictive procedures. Such a search may only be conducted with the *prior* approval of the Warden/designee and based on a finding of reasonable suspicion that a visitor may have contraband. A form for the authorization of such search must be completed by the staff member designated to conduct the search and returned to the Warden for filing. A copy shall be provided to the person being searched. Additionally, no visitor can be detained by the security staff and forced to submit to a strip search. The visitor has the right to leave the institution.

There is none of the required documentation in any of the Jane Doe cases that would indicate that any such search took place. The CCA position is that the reason there is no documentation is because no such search did, in fact, take place.

CCA is therefore placed in the position of proving a negative. There is no audio or video evidence. There is, however, evidence that CCA requires its employees to document any unusual instances of interactions with visitors, such as searches or contraband. Pursuant to policy, CCA provides forms for detailing those interactions as well as requiring documentation in post logs.

3

There is documentary evidence that CCA custom and practice is to notify local law enforcement whenever there is a possible serious breach of the contraband policy. (see attachments). It is SCCF policy to *never* detain or strip search *any* visitor. It is up to the local law enforcement agency to detain and/or strip search those individuals.

The CCA/TDOC policy regarding feminine hygiene products is equally clear. It states, "Visitors may be required to replace their feminine hygiene products *in the presence* of institutional staff only if there exists *individualized reasonable suspicion* to prove that contraband is being brought in."

Jane Does #1, #2, and #3 allegedly all attempted to take feminine pads or tampons into the visiting area. CCA's policy on what is allowed to be taken into the visiting area is clear and very limited. Pads and tampons from outside the institution are not allowed and are by definition contraband. Based upon the sworn testimony as to the interactions of Jane Does #1 and #2, I have found that the officers set forth facts to support a good faith belief as to a finding of reasonable suspicion pursuant to the policy.

To an outsider and one unfamiliar to correctional settings and penalogical interests, the possession of unauthorized feminine hygiene products, may seem to be a trivial matter. To a corrections person it is considered a possible attempt to test the security safeguards regarding contraband. Both visitors and inmates have devised intricate and elaborate ways to pass contraband. The formation of contraband in the shape of a pad or the placing drugs or other contraband inside a used or new pad or tampon is possible and even probable. Inmates generally want to hide contraband in places that security may not want to look. For instance, inmates often conceal contraband in the trash receptacles in their cells and may cover the contraband with a layer of used tissue or toilet paper. Inmates and civilians will often conceal contraband in and around body cavities or genitals, thinking that correctional officers will be reluctant to search those areas.

Jane Doe #1, #2, and #3 allege that they were in fact subjected to what amounted to a strip search by having to expose their genitals to the supervising officer in order to remove and replace their pads. The CCA/TDOC policy, of course, only requires that the officer be present when the pads are changed, not that they have to witness the entire event. The only concern of the officer is that the old pad is discarded and that it is replaced by a pad approved by the institution. There is no need to view the genitals. In their sworn testimony, the named officers indicated that the procedure for requesting a female visitor to replace her feminine hygiene product due to reasonable suspicion is for the officers to accompany the visitor to the restroom and turn their backs while the feminine hygiene product is changed. This procedure would not qualify as either a strip search or body cavity search and would therefore require no documentation. To be classified as a strip search, the officer would have to view the genitals.

I do not have access to all of the material that is to be disclosed during discovery because of time constraints on the due date of my report. However, one aspect of the sworn testimony of

Debra Cornwall stood out to me. Ms. Cornwall was working for the food service company at the CCA facility and was more or less drafted to be a witness when Jane Doe #2 was changing her pads. Ms. Cornwall testified that she heard Jane Doe #2 tell Officer Gonzales that she was finished changing. If Officer Gonzales was intently watching the changing process, there would be no need for Jane Doe #2 to say anything to Officer Gonzales.

The Jane Does allege that they were not allowed to leave the facility and were forced into submitting to an alleged strip search. This, of course, is contrary to the established policy that clearly states that no visitor is to be forcefully detained and can opt to leave the facility in lieu of being searched. This is a policy that all CCA correctional employees are familiar with through their training and knowledge of the facility's policies. Further, CCA employees who are assigned to post of visitation receive additional training from the Senior Corrections Officer and other regularly assigned visitation correctional officers on the visitation post orders and procedures. In fact, a witness listed for the plaintiffs has stated and confirmed that it is general knowledge that a visitor could leave, even if asked to change their feminine hygiene product, when they wanted to.

The CCA employee's responses to the Plaintiffs' interrogatories and the CCA employee's testimony in their depositions make clear that none of the officers remember anything about Jane Doe #3, and at least one of the accused, Mercedes Jones was not even employed at the time of the alleged incident involving Jane Doe #3. Another of the accused, Felicia Roach, has made it clear that she was assigned to an entirely different post when the alleged "searches" occurred and could not have been involved.

Again, it is clear from the interrogatories, depositions, written policy, the sworn testimony of Ms. Cornwall, the documentation of the custom/practice of calling local law enforcement in unusual situations involving visitors/staff and the thorough documentation that CCA has concerning unusual incidents involving visitors/staff that the process of changing feminine hygiene products is not, and should not be considered a strip search.

The training that CCA employees receive is monitored and approved by the State of Tennessee. If the CCA facility is operating as a county jail or workhouse as is the case in Nashville and Chattanooga, the training is monitored and approved by the Tennessee Corrections Institute (TCI). TCI also inspects those facilities on an annual basis. As testified by the officers, it is clear that said officers have undertaken the required training by law, such as pre-service training and in-service training. It is also shown that as to specific posts, both by the officers and witnesses, that on the job training is further undertaken as to the procedures and practices.

If the CCA facility is acting as a state prison, which is the case here, their training is monitored and approved by the Tennessee Department of Corrections. Based upon the history on what I have seen, there is no indication that the training that CCA provides is inadequate. I as the director of the detention inspection and officer training program of the Tennessee Corrections

Institute, have myself trained CCA officers and jail personnel. The training that was provided was proper and more than adequate.

The TDOC also has a full time on-site contract monitor at this facility to ensure that CCA is legally and lawfully fulfilling its contract obligations. If there were any unlawful searches being conducted by CCA, one would believe that they would have been noticed by this monitor.

Plaintiffs allege that there is a gender bias in CCA's policy in that female visitors are treated differently than male visitors. The treatment of both male and female visitors is dependent on the security needs of the institution in the furtherance of a compelling governmental interest. That compelling interest is the need to have a safe environment for inmates, staff and visitors. It is incumbent on the facility to implement policies that will further that need. It is a fact that female visitors have tried to bring contraband into correctional facilities in both body cavities and hygiene products. CCA's policies are a response to reducing that possibility. CCA, as well as most prisons and jails, also has a policy that allows female officers to frisk search both male and female inmates but restricts male officers to frisk searching only male inmates and visitors. The point is that prison policies are based on common sense and the need for security.

I expect for file a supplemental report as I gain access to future depositions or other information.

## D. TESTIMONY IN THE LAST FOUR YEARS AS AN EXPERT AT TRIAL OR BY DEPOSITION

Carter v Goodman et al., U. S. District Court for the Eastern District of Tennessee, Docket No.3:13-CV-00026

Reed v. Monroe County, TN, et al.U.S. District Court of Eastern Tennessee at Knoxville 3:13-cv-00085

Donald Nichols v. Knox County, TN, et al. U.S. District Court No. 3:11-CV-417

Czaja v. Fackler, et al. Bullitt (Kentucky) Circuit Court Civil Action No. 10-CI-01344

Kenneth E. King v Anderson County, Tennessee, Anderson County Circuit. No BOLA0397 (Deposition and trial testimony)

## E. LIST OF PUBLICATIONS

I have authored six articles, all for publication in the journal *Corrections Professional* in 2001. They were:

1.  Shelby County Jail at the Beginning, Best Intentions Gone Wrong

2.  Murder, Gang Control Leads to Court Ordered Jail Overhaul

3.  Shelby County Avoids Sanctions, Rebuilds Broken Jail System

4.  Court Scrutinizes Inmate Population, Jail Design

5.  Amid Frustration, Frayed Nerves, Shelby County Cooperates With Court

6.  "Thunderdome" Jail Fights Intensify Court Scrutiny


## F.  STATEMENT OF COMPENSATION PAID AND/OR TO BE PAID FOR THE REPORT AND TESTIMONY

As stated earlier, my hourly rate is $150.  I have been paid a retainer of $4000 which covers everything up to and including my report.  Additional work will be billed at the hourly rate.


s/Charles Fisher
CHARLES FISHER


4-22-16
DATE

7

Respectfully submitted,

PENTECOST, GLENN, MAULDIN & YORK PLLC

By: s/James I. Pentecost
James I. Pentecost (#11640)
Jon A. York (#23106)
Nathan D. Tilly (#31318)
Attorneys for Defendants
106 Stonebridge Blvd
Jackson, TN 38305
(731) 668-5995 – Telephone
(731) 668-7163 – Facsimile
jpentecost@pgandr.com
jyork@pgandr.com
ntilly@pgandr.com

## CERTIFICATE OF SERVICE

This is to certify that I served a copy of this pleading or paper (Defendants' Rule 26(a)(2) Expert Disclosure) upon each attorney or firm of attorneys appearing of record by U.S. mail, postage prepaid and/or by via electronic mail.

Tricia Herzfeld
Harry Elliott Ozment
William Patrick York , II
Law Offices of Elliott Ozment
1214 Murfreesboro Pike
Nashville, TN 37217

DATE: This the 25th day of April, 2016

PENTECOST, GLENN, MAULDIN & YORK PLLC

By: s/James I. Pentecost
James I. Pentecost
Attorney for Defendants

8