# Exhibit B

*Defendants' Supplemental Expert Report*

Exhibit B

094-174-00

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JANE DOE, et al.,** | ) | |
| | ) | |
| **vs.** | ) | **No.: 3:15-0068** |
| | ) | |
| **CORRECTIONS CORPORATION OF AMERICA, et al.,** | ) | |

---

## DEFENDANTS' SUPPLEMENTAL EXPERT REPORT

---

Defendants, Corrections Corporation of America ["CCA"], Arvil Chapman, Daniel Sullivan, Kelly Garska, Mia Qualls, Gina Gonzales, Felicia Roach and Mercedes Jones, by and through counsel, present this supplemental expert report prepared by Charles Fisher.

## INTRODUCTION

In writing this supplemental, I rely upon my previous report and opinions I stated therein. I also rely upon further information I have reviewed since my last report which includes the Depositions of Danny Dodd, Shane McClain, and Cherry Lindamood. Of course, I have also reviewed the expert reports offered by the Plaintiff's in this case. I'll begin my report with a bit of perspective regarding my view of the nature of contraband in a prison setting.

I agree with Ms. Vaughan that the search for contraband is a constant priority for prisons and jails. The introduction of contraband absolutely threatens institutional security and the safety of inmates, staff and visitors. For example, inmates using drugs pose an obvious problem in that drug use can cause erratic and violent behavior by those inmates. Further, inmates using those drugs may incur a debt to those who sell drugs and lead to violent confrontations when an inmate can't pay what he owes. Prisoners who are gang members can strengthen their influence inside the prison and become defacto leaders inside the prison by selling drugs. These are just some of the dangers without even getting into the area of weapon smuggling.

There are numerous ways that contraband can be introduced into a correctional setting. It can be brought in by employees, outside workers, (both inmates and civilians) the mail and, of course, visitors.

Some correctional institutions have responded to the threat of visitor introduced contraband by eliminating any contact visits. There is even a trend now to institute video visits where visitors don't even have to come to the facility, but instead go to satellite locations away from the facility. The point is that corrections professionals have determined that the problem of visitors passing contraband to inmates during contact visitation is a significant enough problem that the privilege of contact visitation has been removed as a local option.

Currently most prisons have the philosophy that contact visits between inmates and loved ones are helpful for the mental well-being of inmates and assists in the inmates return to society after their sentence is served. Therefore, these correctional institutions have continued to see contact visits as one that is favorable to the inmate. This philosophy means that prison personnel must have a heighted sense of security when dealing with visitors and weigh those concerns against the mission of the prison.

A good analogy is the security a person is subjected to when flying on a commercial airline. First you must present identification and submit your non-carryon luggage to the Transportation Safety Administration (TSA) for possible screening and searching. Next, you pass through a passenger screening line where you are observed and once again asked for identification which is matched with your ticket. You are then asked to submit to a full body scan, which is tantamount to a strip search. At this point your carry-on luggage is scanned. If the scan reveals contraband, your carry-on is physically searched, the contraband removed and thrown away. Anyone who has a tube of toothpaste in their carry-on will have it removed and thrown away. The TSA does not even try to determine whether or not there is actual toothpaste in the tube or if it contains a dangerous substance. All they care about is that it does not get aboard the plane. Some people are even subjected to a frisk search if the TSA personnel feel it is warranted. Most travelers, myself included, do not particularly like this but it is accepted as necessary to maintain airplane safety and most importantly, safety of those travelers.

I say all of this to point out that prisons, and in this case Corrections Corporation of America (CCA) in particular, have an obligation to do what they feel is necessary to prevent the introduction of contraband into their facilities while keeping in mind the sensibilities and dignity of people who are visiting their loved ones.

## OPINIONS & REASONS

1. I strongly disagree with plaintiffs expert who avers that it is standard practice to only pat-search visitors who failed to clear a metal detector or who have "unexplained or suspicious bumps" under clothing. Such a practice would allow visitors to easily introduce contraband into a facility without jail staff knowing. Metal detectors obviously do not detect

numerous items of contraband that are not metal and visitors could conceal drugs or other non-metal contraband in numerous places on their body that would not be noticed by jail staff. The New York System apparently didn't take into account that visitors could easily hide contraband under their clothing without creating "unexplained or suspicious bumps" that would be seen by jail staff. Such a policy is highly insufficient to appropriately prevent contraband from entering a facility and to protect the safety and security of the staff, other visitors and inmates.

If I were in charge of visitation, I would want and insist that all visitors be pat searched. To do anything less strikes me as ludicrous and does not provide safety to employees, other visitors or inmates.

2. I strongly disagree with Ms. Vaughan's contention that "suspicious activity does not amount to reasonable suspicion." Based upon Ms. Vaughan's testimony, it appears that the New York system not only did not consider the need for frisk searches to prevent contraband into a facility, it also did not take in to account the behavior or actions of visitors that might raise suspicions. These behaviors might include, but would not be limited to, being uncooperative, appearing unreasonably nervous, creating prior problems or trying to bring in items that are banned by the facility. Suspicious activity does amount to reasonable suspicion. This seems self-evident and a manner of common sense, but apparently not to Ms. Vaughn. As I alluded at the start of this report, institutional security requires a heightened sense of caution. Thus, any suspicious activity in a prison requires a more aggressive response from jail staff to prevent the introduction of contraband and ensure prison safety. As I said in my initial report, the very fact that a visitor brings an un-allowed item (in this case a sanitary napkin) would, in my opinion, be enough to meet the standard of reasonable suspicion. One <u>might</u> make an allowance if someone were a first time visitor, but none of the plaintiffs were first-time visitors. The list of items approved for visitors to take into the visiting area at SCCF is clearly posted on signs in visitation areas and is found in the Visitation handbook. A regular visitor should know what is and is not allowed into the facility. Anything not listed as an item approved to be brought by visitors is considered contraband and therefore suspicious. Also, officers must consider the possibility that in such a situation a visitor may be attempting to test or manipulate the system for further visits and actions. In such a case, the visitor could be attempting to see what she can get away with to determine whether to try to bring in drugs or other contraband in later visits.

3. I also strongly disagree with Ms. Vaughan's contention that SCCF officers had an obligation to document that they had reasonable suspicion. An officer has no obligation to document every action taken by a visitor which causes the officer to have reasonable suspicion. The TDOC policy does not require such documentation nor are there any forms requiring officers to make such documentation. Officers are required to use their experience and training to make "good faith" determinations as to whether or not a visitor's actions seem suspicious. It would be a mistake, in my opinion, to have officers justify in writing the basis of their suspicions every time they have suspicions. It creates more paperwork and takes away from the officer's ability to move visitors without undue delay so they can visit as long as possible.

Plaintiffs say that requiring a visitor to change feminine hygiene products should likewise be documented. The only actions that require documentation are those things that may affect future actions. Cutting visitation short for violation of visitation rules or actually attempting to bring drugs or weapons into the facility would be a couple of examples as well as creating a disturbance. The prison has forms for those types of incident and officers fill them out as necessary. They are known as incident reports.

There was no reason to fill out an incident report for the Jane Does since there was no "incident" involving drugs, weapons or any other disturbance. The Jane Does proceeded to their visiting areas after changing their pads without incident. Importantly, requesting a visitor to change her pad is not a "search". It is a procedure taken after a search.

4. Plaintiff's experts opines that requiring a visitor to expose their genitalia to a corrections officer is by definition a strip search. I agree. I, however, strongly disagree with her conclusion that SCCF officers were not required to turn their backs while female visitors changed their feminine hygiene products.

Every correctional officer in the State of Tennessee is trained on what constitutes a strip search. A person need not be completely nude to qualify as a strip search.

The custom and practice of CCA is that no visitor will be strip searched. They have a policy which allows a visitor to be strip searched, but only upon the authorization of a Warden or designee. Such authorization has never been given by a CCA Warden and no visitors have ever been strip searched.

The CCA practice is to call local law enforcement agencies to inform them of possible cases where a visitor might have tried to introduce contraband, but CCA does not detain the visitor, and they have no authority to do so. Again, the practice is not to strip search visitors.

All Correctional Officers may not be trained on conducting visitation since this is a specialized duty in which not all officers will be involved. The deposition testimony indicates that those officers assigned to work visitation receive instructions from the supervising officer on how they should perform their duties.

Those procedures, which are understood by and carried out by the supervising officer require that two officers accompany a visitor into the bathroom and turn their back while the visitor changes her pad. To observe the actual changing of the pad would constitute a strip search, which the policy does not allow and which would have to be approved by the Warden. Every officer receives training on the definition of a strip search and knows not to view the unclothed genitalia of a visitor. After the visitor changes her pad, the pad is then discarded. It may be inspected, but as with the TSA at an airport, it does not have to be. As long as the pad is discarded, the officers have successfully prevented any possible contraband from entering the facility.

5. There is no requirement that a visitor be permanently suspended from visitation privileges if she refuses to change her pad. There could be a suspension, but whether or not that occurs would depend on other factors such as the behavior of the visitor and further administrative action.

6. CCA policies, procedures, and training meet or exceed industry standards. CCA operates under policies promulgated by the Tennessee Department of Corrections (TDOC) and which have been accredited by the American Correctional Association (ACA). CCA has been accredited by the ACA in all aspects of its operations. ACA is a professional organization made up of the leading correctional practitioners in the United States. ACA accreditation could rightly be seen as the leader in correctional operations.

CCA and all of its operations have been scrutinized and approved by the ACA. To say that any aspect of their operations does not meet industry standards in not correct.

/s Charles Fisher
Charles Fisher

06/21/16
Date

Respectfully submitted,

PENTECOST, GLENN, MAULDIN & YORK PLLC

By: s/James I. Pentecost
James I. Pentecost (#11640)
Jon A. York (#23106)
Nathan D. Tilly (#31318)
Attorneys for Defendants
106 Stonebridge Blvd
Jackson, TN 38305
(731) 668-5995 – Telephone
(731) 68-7163 – Facsimile
jpentecost@pgandr.com

**CERTIFICATE OF SERVICE**

This is to certify that this Notice of Compliance was served electronically via the Court's ECF system on the following:

Tricia Herzfeld
Harry Elliott Ozment
William Patrick York, II
Law Offices of Elliott Ozment
1214 Murfreesboro Pike
Nashville, TN 37217

Jane Doe #3

DATE: This the 21st day of June, 2016

PENTECOST & GLENN, PLLC

s/James I. Pentecost