# Exhibit C

*Excerpts of Fisher Deposition*

Exhibit C

```
 1    A.        Just based on their knowledge and experience.
 2    Q.        And does the report cite everything that you
 3    did in order to form your opinion?
 4    A.        Yes.  As far as I know, yes.
 5    Q.        Okay.  So there is nothing else that you did
 6    in forming your report?
 7    A.        No.
 8    Q.        And do you -- does your report in your
 9    supplemental contain a complete statement of all the bases
10    and reasons for your opinions?
11    A.        Yes.
12    Q.        Okay.  In the course of writing your report
13    and forming your opinions, did you abandon your theories?
14    A.        Not that I recall.
15    Q.        Did you change your mind on anything?
16    A.        No.  I may have added something.  You know,
17    once you write a report, then you look to see if there is
18    anything you left out.  You go back over the complaint and
19    everything.  So I may have altered it like that.  But as
20    far as saying -- kicking something out, I didn't do that.
21    Q.        Okay.  And I'm assuming you have reviewed
22    your report and supplemental report before your deposition
23    today?
24    A.        Yes.  I read it yesterday.
25    Q.        And is there anything that you would like to
```

Exhibit C

```
 1    change or revise in those?
 2    A.       Not that I recall, no.
 3    Q.       Is there anything that you are not giving an
 4    opinion on?
 5    A.       You're going to have to explain.  Such as?
 6    Q.       Do you feel that your reports opine on the
 7    ultimate issue of liability in this case?
 8    A.       Oh, I'm not about liability.  I'm about
 9    correctional practices.  Someone else will have to
10    determine liability.
11    Q.       Okay.
12    A.       I'm not an attorney.
13    Q.       Okay.  And do you feel you're opining on
14    legal conclusions?
15    A.       No.  I'm opining on correctional practices,
16    policies and procedures, and corrections custom and
17    practices.
18    Q.       Okay.  And did you personally draft each of
19    your reports?
20    A.       Yes.  Wrote it out in longhand.
21    Q.       Longhand?
22    A.       Longhand.
23    Q.       Wow.
24    A.       Well, because you make changes and stuff like
25    that.  I mean, I can type.  I'm not that bad.  But I write
```

Exhibit C

| | |
|---|---|
| 1 | A.　　　That is correct. |
| 2 | Q.　　　Okay. And what is your understanding of the |
| 3 | documentation that they needed to change their pads in the |
| 4 | presence of correction officers? |
| 5 | A.　　　There's no documentation of that either. |
| 6 | Q.　　　Did you see the logbooks in this case? |
| 7 | A.　　　No. |
| 8 | Q.　　　Okay. Would you expect to see notations if a |
| 9 | visitor was asked to change her feminine hygiene product |
| 10 | in the presence of a correction officer? |
| 11 | A.　　　Not necessarily. |
| 12 | Q.　　　Okay. And why not? |
| 13 | A.　　　Well, it's -- there's nothing really unusual |
| 14 | about it. The things that mainly you document are those |
| 15 | things that can have a bearing on institutional security |
| 16 | or information you may need at a later time. |
| 17 | 　　　　Now, there was no contraband found on either |
| 18 | Jane Doe, as I recall. And, therefore, you know, they |
| 19 | proceeded to go to their visit as they normally would. So |
| 20 | it was kind of no harm, no foul. We want you to change, |
| 21 | you did change, and -- I'm not going to say -- well, it is |
| 22 | routine. I mean, that's the way they did it. If they |
| 23 | needed them to change their pad, then they would ask them |
| 24 | to change their pad, go in there and turn their back. And |
| 25 | it was not something that one would normally document, |