```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF TENNESSEE
                    NASHVILLE DIVISION
_____

JANE DOE #1; JANE DOE #2; and JANE DOE )
#3, on behalf of herself and as next   )
friend of MINOR DOE #1, MINOR DOE #2,  )
and MINOR DOE #3,                      )
                         Plaintiffs,   ) Case No.
                                       ) 3:15-cv-68
vs.                                    )
                                       )
CORRECTIONS CORPORATION OF AMERICA;    )
ARVIL "BUTCH" CHAPMAN, in his          )
individual capacity and in his         )
official capacity as warden of the     )
South Central Correctional Facility;   )
DANIEL SULLIVAN, in his individual     )
capacity and in his official capacity  )
as chief of security of the South      )
Central Correctional Facility; KELLY   )
J. GARSKA, in her individual and       )
official capacities; MIA W. QUALLS, in )
her individual and official capacities;)
FELICIA D. ROACH, in her individual and)
official capacities; MERCEDES JONES, in)
her individual and official capacities;)
DEBRA ROBERTS CORNWALL, in her         )
individual and official capacities;    )
and TRINITY SERVICES GROUP, INC.,      )
                         Defendants.   )
_____

                    Deposition of:
                    CHARLES FISHER
                    June 23, 2016
             Taken on behalf of the Plaintiffs
_____


              BRIGGS & ASSOCIATES COURT REPORTING
                        LINDA WORLEY
                  222 Second Avenue North
                       Suite 360M
                Nashville, Tennessee 37201
                      (615) 440-7405
```

the private prisons?

A. No. No. That -- because they figured out that if they signed the contract with the Department of Corrections, then the Department of Corrections would have a contract monitor who would be the one to make sure they were following the rules.

Q. Okay. And then you went from assistant director to senior detention specialist. What is a senior detention specialist?

A. Well, in 1999 we got a new director, and he wanted to make a change. So he called me in and said, look --

And I was living in Covington and driving up there every week to Nashville, stayed in a motel, stuff like that. And, just to be honest with you, he had gotten some pressure because I was getting too thorough in my inspections, and they wanted somebody else in there. I made some people mad because of I said they were doing stuff they shouldn't do, and one of them was the mayor of Memphis, Jim Rowd at the time, and he wanted to fire me.

So instead of that, Roy Nixon, who was the new director, asked me to take a -- I guess you would say a demotion so he could put somebody else in there and take the heat off. That way, I didn't have to travel to Nashville anymore. And he also fixed it so I did not have

Case 3:15-cv-00068   Document 152-2   Filed 09/09/16   Page 2 of 11 PageID #: 5279

```
 1   Q.           -- do you mean the TDOC policies?
 2   A.           Yes.  The TDOC policies, which CCA follows.
 3   Q.           Okay.
 4   A.           What are required contractually to follow,
 5   yes.
 6   Q.           And what about the CCA policies?  That would
 7   be the 920 and 91.  Are those, to your knowledge, reviewed
 8   by TDOC?
 9   A.           They should be.  That -- not to my knowledge,
10   but I know they would be reviewed by ACA because ACA will
11   look at every policy, post order, and everything that you
12   have in making their determination as to whether or not
13   you would be certified.
14   Q.           Okay.  And do you have any information
15   specifically that the ACA reviewed those particular CCA
16   policies in this case?
17   A.           Only that I know that they reviewed all of
18   them when they go to a place.
19   Q.           Okay.
20   A.           I know how the process works.
21   Q.           But do you have any information that,
22   specifically, that these policies are reviewed by the ACA?
23   A.           Yes.  Because they certify the place.  That
24   indicates to me they have been reviewed, because they
25   review everything, again.  I mean, you can say that -- do
```

security about. Heightened sense of observation, if you will. But she did go ahead and let them visit, but she made a mental note, what they refer to in here as their radar list, which I think is kind of -- I don't -- the term "radar list." But, anyway, that's -- so she delineates pretty well what her concerns were and how she came to the conclusion that there was reasonable suspicion, in her mind, that this was worthy of enhanced scrutiny.

Q.	Okay. And when you're talking about bringing in a pad, you're -- I want to clarify about when you just gave your opinion about bringing in a pad of reasonable suspicion, in and of itself --

A.	Yes.

Q.	-- that someone's bringing in contraband, you mean to include both the spare pad, as we'll call it, the replacement pad, as well as the pad that the individual is wearing?

A.	The pad that the individual is wearing I would simply make her change out -- make a female change out and use one of our pads just as a reasonable precaution for -- you know, just in case it does have contraband in it. I mean, it's really not a big deal, but it's -- because women do have periods, women do wear feminine hygiene products, pads. And but just to be on

the safe side, you didn't get it from us, let's change it out. It's possible that it could have contraband. Not saying it does, but let's change it out. Just -- but if someone's bringing in a spare one, that is clearly not allowed for not -- they're not allowed to do that.

So, in summary, I would say that while wearing a pad might not be considered contraband in and of itself, because that's a natural thing that people may wear, there is certainly no harm in asking them -- erring on the side of caution and asking them to replace the pad they're wearing with one that you provide.

Q. Okay.

A. But bringing in an extra pad, that's a whole different ball game, in my opinion.

Q. Okay. So I just want to be clear.

A. Okay.

Q. So, in your opinion, is wearing a pad into the facility without bringing in a replacement pad, just wearing a pad into the facility, does that constitute reasonable suspicion that a person is bringing in contraband?

A. Not -- I wouldn't say the one that they're wearing. But, then again, I would ask them to change it out.

Q. Okay. So you don't think that that alone is

Q.  Could you have the visitor hand the discarded pad to an officer; here, here it is?

A.  No, you wouldn't want to do that. I mean, the thing is to get rid of the pad, yes.

Q.  So would that be an alternative, that the person goes in and, when they change their pad, they hand the soiled pad to the officer?

A.  It could be an alternative, but that's not what I would do.

Q.  Okay. And why not?

A.  Because you want to make sure that the pad is changed out. And the only way to make sure that the pad is changed out and to be absolutely sure --

who knows? She could have two pads on under there and throws one away, keeps the other one. So the only way to know for certain is to have them throw away the pad and put on yours.

Q.  Okay. And how do you know that she doesn't have on two pads or that she hasn't just thrown away the CCA pad if the person isn't observing them?

A.  Well, you observe the pad that's thrown away. I mean, you don't check it. Just like at the airport, they see me throw away my toothpaste, but they don't search the toothpaste.

Q.  Okay. So if the important thing is seeing

```
 1   visitation receive additional training from the senior
 2   correction officers and other regularly assigned
 3   visitation correctional officers on visitation post orders
 4   and procedures."  What is your basis for that opinion?
 5   A.          That's what I -- specifically, Gonzalez and
 6   Garska, when they indicated -- I think one of them --
 7   could have been Garska, could have been Gonzalez --
 8   specifically saw that a Ms. Layne, who had been there for
 9   a while and was no longer doing visitation, but she looked
10   at the post orders and she found -- she got input from
11   Ms. Layne about how all this stuff is supposed to go.  So
12   that's...
13   Q.          But that's in that sentence, you're not
14   referring to any formal training other than the on-the-job
15   training you've just described?
16   A.          Correct.
17   Q.          Okay.  Skipping down to the paragraph that
18   starts with "again."  "Again, it is clear from the
19   interrogatories, depositions, written policies and the
20   sworn testimony of Ms. Cornwall, the documentation, and
21   the custom and practice of local law enforcement in
22   unusual situations involving visitors and staff and the
23   thorough documentation that CCA has concerning unusual
24   incidents involving visitors and staff that the process of
25   changing feminine products is not and should not be
```

Case 3:15-cv-00068   Document 152-2   Filed 09/09/16   Page 7 of 11 PageID #: 5284

considered a strip search."

A. Correct.

Q. Okay. And that is your opinion, based on everything that you've read?

A. That's correct.

Q. And your opinion is that if they looked, it would be a strip search?

A. That's correct.

Q. Okay. And in your review of the documentation and testimony you've been provided in this case, did it indicate to you that there was any specific pre-service or in-service trainings on how to deal with visitors on their periods?

A. No. I'm sure there is not. Because, again, it's a specialized class -- excuse me. It's a specialized post, which not everybody is going to be assigned -- I hate to end with a preposition. That they're going to be assigned to it. Only a few are the ones who get trained.

Q. Okay. And is your understanding that there are specific blocks of training for visitation, or there can be?

A. There would be a general block in the basic training that everybody has, just so they'll kind of have an understanding. But as far as the nitty gritty nuts and bolts, that would be done by the senior officer to people

who are assigned. And then the person who is the senior officer would get their information from the other senior officer, or possibly the warden or somebody else if that person is not available to say, well, what does this mean, that type of thing.

Q. Okay. And then in the next paragraph you say, "If the CCA facility is acting as a state prison, which is the case here, their training is monitored and approved by the Tennessee Department of Corrections." Is that correct?

A. That's correct, yes.

Q. And do you know if the TDOC monitors specifically have gone through the changing of a pad or how to deal with women on their periods at this facility?

A. Not to my knowledge. I've not seen any information to that effect.

Q. So do you know if TDOC knew at all what the process was for having a female visitor change their feminine hygiene product at South Central?

A. I don't know what they knew. That's correct.

Q. Or if they knew anything at all?

A. Or if they knew anything at all. I just don't know.

Q. Okay. In all your years as a trainer for TCI and the various other things that you've done, you've

A.          I do.  If they're not visiting and they are watching staff, yes, then to me, that's going to hit my senses as, why are they not speaking to each other?  Why are they watching me?  Are they trying to figure out patterns?  Are they trying to look for some sort of opening, some sort of opportunity to do something that they shouldn't be doing?  They should not be paying attention to me at all.  I mean, I'm going to walk around and I'm going to be at my post, but for them to be looking at me the entire time, yeah.  And I'm the authority.  Yeah, to me, that's suspicious.

Q.          Okay.  And is that suspicious activity, focusing on the staff, would that also be the same as reasonable suspicion?

A.          Could be, yes.  It could be.  Now, they're already in there and they've already been through checkpoints, but that doesn't mean that they are absolutely clean, as I pointed out earlier.  There are still ways that people can bring in contraband even after undergoing a frisk search, the metal detectors, the scans, changing out the pads, the whole nine yards.  For all we know, they could have something up their nose or around their ear or some other body cavity that was not searched.  So, yes.  Now, is it going to cause me to go search them again?  No.  But I am going to watch them closer.

Case 3:15-cv-00068   Document 152-2   Filed 09/09/16   Page 10 of 11 PageID #: 5287

```
STATE OF TENNESSEE      )
COUNTY OF WILLIAMSON    )
```

I, LINDA WORLEY, LCR, Licensed Court Reporter in and for the State of Tennessee at large,

DO HEREBY CERTIFY that the foregoing was taken at the place set forth in the caption thereof; that the proceedings of said were stenographically reported by me in shorthand; and that the foregoing pages constitute a true and correct transcription of said proceedings to the best of my knowledge, skills and ability.

I DO FURTHER CERTIFY that I am not related to nor an employee of counsel or any of the parties to the action, nor am I in any way financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office July 15, 2016, at Brentwood, Tennessee.

_____

Linda Worley, LCR
LCR #124, Expires 6-30-18

Briggs & Associates Court Reporting
(615) 482-0037

203

Case 3:15-cv-00068   Document 152-2   Filed 09/09/16   Page 11 of 11 PageID #: 5288